J-S69034-17

2017 PA Super 402

COMMONWEALTH OF PENNSYLVANIA  :   IN THE SUPERIOR COURT OF
                    :         PENNSYLVANIA
        Appellant        :
                    :
                    :
        v.            :
                    :
                    :
TATIAHNA AFRICA HARRIS      :   No. 686 WDA 2017

Appeal from the Order April 24, 2017
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s):  CP-65-CR-0006281-2016

BEFORE:   BOWES, J., RANSOM, J., and STEVENS*, P.J.E.

OPINION BY STEVENS, P.J.E.:          **FILED DECEMBER 20, 2017**

The Commonwealth appeals from the order entered in the Court of Common Pleas of Westmoreland County granting the pre-trial suppression motion filed by Appellee Tatiahna Africa Harris.  After a careful review, we reverse and remand for further proceedings.

The relevant facts and procedural history are as follows: Appellee was arrested, and he was charged with receiving stolen property, criminal use of a communication facility, firearms not to be carried without a license, possession with the intent to deliver a controlled substance, and possession of drug paraphernalia.[1]  On February 24, 2017, Appellee filed a counseled, pre-trial motion seeking to suppress the physical evidence seized by the

---

[1] 18 Pa.C.S.A. §§ 3925, 7512, 6106, and 35 P.S. §§ 780-112(a)(30), (16), and (32), respectively.

---

\*   Former Justice specially assigned to the Superior Court.

police from his vehicle and person. Specifically, Appellee averred a police officer improperly stopped his vehicle based solely on unreliable allegations made to the officer from a confidential informant ("CI"). Further, Appellee averred that, prior to a K-9 sniff of his car, the police officer arrested Appellee without probable cause. Accordingly, Appellee contended that all physical evidence seized by the police should be suppressed as "fruit of the poisonous tree."

On April 24, 2017, the matter proceeded to a suppression hearing at which the sole testifying witness was Greensburg Police Officer Garret McNamara. Specifically, Officer McNamara testified that he has been a police officer with the Greensburg Police Department for three years and, throughout this time, a certain CI has provided information to the police department with regard to illegal drugs. N.T., 4/24/17, at 5. Officer McNamara indicated that he has personally received information from the CI in five other cases, four of which have led to convictions and one of which was pending. *Id.* at 5-6.

On November 5, 2016, during the afternoon, Officer McNamara received information from the CI indicating that, later in the day, a black male in a white sedan would be coming from a gym to sell crack cocaine at a residence on Euclid Avenue and then returning to Jeanette. *Id.* at 6-7. The officer knew the CI frequently stayed at the residence on Euclid Avenue, and the CI told him he was currently staying at the residence. *Id.* at 7. Officer

McNamara also knew the CI, as well as other people who resided at the residence on Euclid Avenue, "to be user[s] of crack cocaine[.]" *Id.* at 8.

The CI indicated that he would be willing to provide additional information with regard to the sale of the crack cocaine; however, he was concerned someone in the house might overhear him on the telephone. *Id.* at 8-9. Accordingly, Officer McNamara and the CI agreed that when the male dealer "would be leaving the residence, [the CI] was going to call dispatch and hang-up and dispatch would know the phone number and they would inform [Officer McNamara] that meant that the male, [who] was selling the crack cocaine, was leaving the residence." *Id.*

Later that day, Officer McNamara, who was in the area of Euclid Avenue, received a dispatch informing him that the awaited for "hang-up phone call had come in[.]" *Id.* at 9. Officer McNamara testified that, less than 30 seconds later, he saw a white sedan matching the description provided to him by the CI leaving Euclid Avenue and travelling towards Jeannette. *Id.* at 9-10. In response, Officer McNamara provided the plate number to the police dispatch, who replied that the vehicle was registered to "Destiny Wise out of Herminie." *Id.* at 10, 17-18. Based on his training, Officer McNamara was aware that "it is common for individuals selling drugs to use other people's vehicles[.]" *Id.* at 18.

Officer McNamara indicated that, as he followed the vehicle, he "observed window tint on the vehicle and [he] initiated a traffic stop." *Id.* at

- 3 -

10. He testified the window tint, which covered all of the vehicle's side windows, was "extremely dark" and, as a result, he could not see inside of the vehicle through the passenger side of the vehicle. *Id.* He noted that, when looking through the passenger-side window, he could not determine whether a male or female was driving the vehicle. *Id.*

Officer McNamara effectuated a traffic stop of the vehicle "just outside of the city," and identified the sole occupant, Appellee, who was driving the vehicle. *Id.* at 10-11. Appellee informed him that "he was coming from the gym and he was going to go back home towards Jeannette." *Id.* at 12. Appellee denied "ever being on Euclid Avenue." *Id.* Officer McNamara, who had just followed Appellee's vehicle from Euclid Avenue, informed Appellee that he had just seen him on Euclid Avenue; however, Appellee continued to deny that he had been on Euclid Avenue. *Id.*

Officer McNamara requested assistance from the K-9 unit and twice requested Appellee to exit the vehicle. *Id.* at 13, 21. Appellee refused, resulting in Officer McNamara opening the driver's side door, grabbing Appellee's arm, and removing him from the vehicle. *Id.* at 21. After Appellee was out of the vehicle, he was handcuffed and the K-9 sniffed the exterior of the vehicle, alerting the police to the front driver's seat and the front headlight. *Id.* at 13.

As a result, Officer McNamara conducted a search of the vehicle, discovering a handgun under a pile of clothes on the rear driver's seat,

$265.00 in U.S. currency, two cell phones, and an Altoids container, which the officer believed contained drug residue. *Id.* at 14-15. The officer provided the serial number of the gun to police dispatch, who responded that the handgun had been reported stolen, and Officer McNamara determined that Appellee did not have a valid license to carry a firearm in a vehicle. *Id.* at 15-17.

At this point, the officer placed Appellee in the back of the police cruiser, indicating he was under arrest, and subsequently conducted an inventory search of Appellee at the police station. *Id.* at 17. During this search, the officer discovered Appellee had crack cocaine inside of his boxer briefs, as well as additional currency on his person. *Id.* Subsequent testing revealed the Altoids container did not contain drug residue.

On cross-examination, Officer McNamara confirmed that he did not observe the white sedan arrive at the Euclid Avenue address, but "30 seconds later [he saw] the vehicle, that [he] believe[d] was described by the [CI], leave the residence in that area[.]" *Id.* at 24. Officer McNamara indicated he followed the sedan for roughly one mile before effectuating a traffic stop. *Id.* Officer McNamara confirmed the sedan had dark window tint and the license plate information indicated the sedan belonged to Destiny Wise. *Id.*

Officer McNamara clarified that, prior to stopping the sedan, he was aware that a black male, and not a female, was driving the sedan. *Id.* at 25. Specifically, he testified:

**Q:** But you don't know if Destiny Wise is driving the car at this point?

**A:** Well, it was a black male driving that vehicle, sir.

**Q:** Well, how do you know that? You didn't see a black male driving the vehicle, did you?

**A:** Yes, I did.

**Q:** And when was that?

**A:** Whenever he was coming up Euclid, coming passed [*sic*].

**Q:** You were able to see through the window tint and identify a black male?

**A:** His driver window was down. The passenger window was the window that was up.

**Q:** So his driver window was down, and at that point you're able to see a black male?

**A:** Yes, sir, at that time.

**Q:** And that confirms the information you had received previously, correct?

**A:** Yes.

*Id.* at 24-25.

Further, on cross-examination, as to the reason he stopped the vehicle, Officer McNamara testified as follows:

**Q:** So at some point you do initiate a motor vehicle stop, but this would be for the window tint that you have observed, correct?

**A:** Yes, sir.

**Q:** Okay. Then, you follow up by approaching the vehicle, right?

**A:** Yes, sir.

**Q:** At that point you observed a black male driving the car?

*** 

Did you inform him why he was being pulled over at that point?

**A:** I told him window tint.

*Id.* at 26-27.

Officer McNamara confirmed that he determined Appellee had a valid driver's license but asked him to step out of the vehicle. *Id.* at 28. Officer McNamara noted Appellee twice refused, so he assisted him out of the sedan and handcuffed him as he waited for the K-9 unit. *Id.* at 29-32. Although Appellee was handcuffed, Officer McNamara indicated that Appellee was permitted to stand behind the white sedan and he was not placed in the police cruiser at this time. *Id.* at 32. The K-9 sniff occurred approximately fifteen minutes later. *Id.* at 29-32.

As to whether Officer McNamara had evidence that the search of the sedan would yield contraband, the relevant exchange occurred:

> **Q:** At this point [when you remove Appellee from the vehicle and handcuff him,] you have no evidence that [Appellee] has any drugs on his person, do you?
>
> **A:** Besides my reliable informant, no, sir.
>
> **Q:** And you don't see any kind of drugs in the vehicle?
>
> **A:** Not in—no, not in plain view.
>
> **Q:** And you don't see a firearm sitting in the rear, do you?
>
> **A:** I can't see through that tint, sir.
>
> **Q:** So at this point [before the K-9 sniff] there's really nothing more than the [CI's] word and the fact that [Appellee's car] windows are tinted, correct?
>
> **A:** Correct.
>
> **Q:** Okay. So the dog does eventually arrive on scene, right?

- 7 -

**A:** Yes, sir.

**Q:** And it gives some indication that there [is] some form of narcotics in the vehicle, right?

**A:** Yes, sir.

\*\*\*

**Q:** So, after the dog makes the hits, you actually open up the vehicle, right, to perform a search?

**A:** Yes, sir. We searched the vehicle.

**Q:** And at that point you find the firearm, correct?

**A:** Yes, sir, the handgun.

*Id.* at 34-35. Officer McNamara indicated that Appellee was then informed he was under arrest and placed in the police cruiser. *Id.* at 36.

On re-direct examination, Officer McNamara reiterated that, prior to initiating the traffic stop, he was able to view the driver through the driver's side window, which was rolled down, and that the driver and vehicle matched the description provided to him by the CI. *Id.* at 38. The relevant exchange occurred between Officer McNamara and the prosecutor:

**Q:** At some point, I guess, when you're dealing with this informant, on the other occasions when you've dealt with this person, had they told you identifying information that they knew about an individual who was going to be selling drugs or having drugs----

**A:** Yes, sir.

**Q:** --if the informant knew the person?

**A:** Yes, sir.

**Q:** Did you investigate at all or talk at all with the informant about whether or not they knew any identifying information about this person?

**A:** I did.

**Q:** Okay. And did the informant know any identifying information about who was coming to sell crack that day?

- 8 -

**A:** He did not. He wasn't really privy to that information. He just knew that a black male in a white sedan was coming.

**Q:** Okay. Did he advise you whether he or someone else in the home had ordered up, for lack of a better term, the drugs that day?

**A:** Yes, sir. Another resident he told me was purchasing cocaine.

**Q:** Okay. So the information he got from that person was what he relayed to you, and it didn't include the name or anything identifying, other than black male in white sedan?

**A:** Correct.

*Id.* at 38-39.

Upon questioning by the suppression court, Officer McNamara clarified the CI contacted him and in an initial conversation the CI reported a male was "coming to Euclid to sell." *Id.* at 40. He believed the CI identified the buyer at that time as "Juanita." *Id.* at 41. In a second conversation, which occurred approximately half an hour later, the CI reported the buyer was going to be a black male driving a white sedan. *Id.* at 43. Officer McNamara admitted that he did not ask the CI how he knew this information, and the CI did not unilaterally provide him with such information. *Id.* He noted that, during the second conversation, they devised the plan whereby the CI would call dispatch and hang-up as a signal that the sedan was leaving the Euclid Avenue residence with "the deal just being done." *Id.* at 44.

Upon further redirect examination, Officer McNamara confirmed that he was aware the CI had acted as an informant for the Greensburg Police in

the past. *Id.* at 47. Moreover, Officer McNamara noted that the CI had told him that the other residents of Euclid Avenue did not "trust him." *Id.* Thus, the CI told the officer that, when drug deals occurred at the residence, he was put in the bathroom with the door shut so that all he could see was the car arriving. *Id.* at 48.

Officer McNamara again confirmed that he was posted near the subject Euclid residence and, within 30 seconds of being contacted by dispatch regarding the pre-arranged hang-up signal, he observed the white sedan leaving Euclid Avenue. *Id.* at 49. The officer noted that he knew the "Juanita" to whom the CI referred, Juanita was a user of drugs, and, in fact, Juanita had been arrested and prosecuted successfully based on past information provided to the officer from the CI. *Id.*

At the conclusion of the suppression hearing, the suppression court granted Appellee's motion to suppress, and the Commonwealth filed a timely notice of appeal, certifying therein that the suppression court's order would terminate or substantially handicap the prosecution of Appellee. *See* Pa.R.A.P. 311(d) (permitting the Commonwealth to appeal from an interlocutory order if it certifies the order will terminate or substantially handicap the prosecution). The lower court ordered the Commonwealth to file a Pa.R.A.P. 1925(b) statement, and the Commonwealth timely complied. The suppression court filed a Pa.R.A.P. 1925(a) opinion explaining the

reasons for its suppression ruling. Specifically, the court relevantly indicated the following:

> There was insufficient probable cause to justify the stop of the vehicle and the warrantless arrest of its occupant.
>
> In **In re O.A.**, 552 Pa. 666, 717 A.2d 490 (1998)[(plurality, Cappy, J.)] because the informant did not establish probable cause, coupled with the lack of independent corroboration by the arresting officer, the evidence seized as a result of the warrantless search was suppressed. [In that case,] like the case at bar, the CI provided no information as to when he saw drugs in the defendant's possession, or if he observed any drug transaction.
>
> The court [in **In re O.A.**] noted that the case involved the convergence of a warrantless search with a warrantless arrest. A warrantless search is presumed unreasonable unless incident to probable cause. **Id.** at 495. Probable cause exists at the moment the arrest occurs where the facts and circumstances within the officer's knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed. Mere suspicion is not a substitute for probable cause. **Commonwealth v. Stokes**, 480 Pa. 38, 389 A.2d 74 (1978). Where the officer's actions resulted from information gleaned from an informant, the informant's veracity, reliability, and basis of knowledge must be assessed. In **Stokes**, the informant had been told by a third party that the defendant admitted to a shooting. This hearsay information was deemed insufficient to establish probable cause.
>
> The lower court in **In re O.A.** relied on the assertion that the informant provided reliable information in the past-the officer claimed that the CI had provided tips leading to 50 arrests. The Supreme Court, however, concluded that an assertion by a police officer as to an informant's reliability, with no objective facts to substantiate his assertions, is insufficient to support a finding of probable cause. **Id.** at 496. The court found that where police are acting solely on the basis of an informant's tip, and the reliability of the CI is not established by objective facts, it is essential that the tip provide adequate communication that the informant has actual knowledge that criminal conduct is occurring or has occurred at the time the warrantless arrest is made. **Id.** at 497.

The police officers in *In re O.A.* did not personally observe any drugs in the defendant's possession, nor did they observe any drug transactions. Thus, the court concluded the record was devoid of any facts that would support a finding that the informant's unsubstantiated tip was corroborated by other evidence gathered by the arresting officers. [The court in *In re O.A.* held that "[a] finding of probable cause in the instant case would amount to a finding of probable cause to arrest any person on the street corner by the mere assertion of a police officer that a CI told him this particular individual was dealing drugs and that the CI was reliable." The court refused to condone arrests based upon the bald assertions that an informant had proved reliable in the past, without any consideration of whether there is a fair probability that the person arrested actually committed a crime.

In *Stokes*, the court noted that information provided by certain classes of persons may be sufficient to establish probable cause: the uncorroborated confession of an accomplice, or the statement of a victim, or an eyewitness whose identity is known. In *Stokes*, the arresting officer relied upon information by an informant who was not an accomplice, eyewitness or victim, and which amounted to hearsay by one who had no first-hand knowledge of the crime. Because the CI's information was hearsay, and did not establish probable cause, the evidence was suppressed.

In *Commonwealth v. Clark*, 611 Pa. 601, 28 A.3d 1284 (2011), the court held that an informant's tip may constitute probable cause where the tip is independently corroborated, or where the informant has provided accurate information of criminal activity in the past, or where the informant himself participated in the criminal activity. In *Clark*, although the affidavit contained no express statement quantifying the CI's reliability or basis of knowledge, the police had corroborated significant details of the informant's tip the day before by observing a controlled buy of narcotics. Thus, suppression of the evidence was not warranted because police corroborated the informant's tip.

The court [in *Clark*] also noted that when a CI is used, the affidavit must at the very least contain an averment that the informant has provided information which has in the past resulted in arrests or convictions. *Id.* at 1291.

***

[T]his court concludes that the stop of [Appellee's] vehicle was without probable cause and his arrest invalid.

The Commonwealth contends, however, that the stop of [Appellee's] vehicle was due to its tinted windows. While a stop based upon this violation of the Motor Vehicle Code is certainly reasonable, the same cannot be said when the driver is removed from the vehicle, placed in handcuffs, put into the back of a police cruiser, and not permitted to leave while a K-9 unit is summoned. This conduct makes it clear that the stop for illegal tint was merely a pretext to stop the vehicle until it could be searched. A stop for tinted windows is based upon probable cause, not reasonable suspicion, because there is nothing more that needs to be investigated. *See Commonwealth v. Sands*, 887 A.2d 261 (Pa.Super. 2005). Thus, [Officer] McNamara's only remaining duty was to issue a citation, not place the driver in handcuffs and detain him. This is particularly true in view of the fact that [Appellee's] behavior was not furtive, no contraband was in plain view, and his [driver's] license was valid.

Furthermore, it is unclear whether Officer McNamara was able to determine the race of the driver because the windows were tinted. A description of a white sedan, located near the Euclid Avenue address, and spotted within 30 seconds of the CI's call, was insufficient probable cause to stop the first white car this officer observed. This description was too vague and non-specific, even if the officer had seen a black man driving the vehicle.

Finally, it is notable that [Officer] McNamara did not seek a warrant to search the vehicle. Given the scanty information provided by the CI, a neutral and detached magistrate should have made a determination of probable cause. Failure to take even this step implies that the officer suspected that a warrant may not have been issued.

In summary, the court finds that. . .the motion to suppress [is] granted. The hearsay information provided by the CI was unsubstantiated and did not establish probable cause to arrest. The stop of the vehicle for tinted windows was pretextual and once stopped, no additional information was produced to warrant a continued detention. Because no search warrant was ever obtained, the items seized from the illegal search must be suppressed. [Appellee's] arrest, based upon this seizure, was a

warrantless arrest without probable cause.  Thus, the seizure was unlawful and the motion to suppress is granted.

Suppression Court Opinion, filed 6/19/17, at 4-8 (citations and bold omitted).

On appeal, the Commonwealth avers the suppression court erred in granting Appellee's motion to suppress.  In this regard, the Commonwealth specifically argues: (1) Officer McNamara was permitted to stop Appellee's vehicle under 75 Pa.C.S.A. § 4524(e), and the court erred by ruling this was an improper "pretext" for stopping the vehicle; (2) after stopping Appellee's vehicle, Officer McNamara was permitted to ask him a few questions, as well as ask him to exit the vehicle; (3) based on the totality of the circumstances, Officer McNamara had reasonable suspicion beyond the initial stop to detain Appellee to permit a K-9 sniff of the exterior of the vehicle; and (4) following the K-9 sniff, Officer McNamara had probable cause to make a warrantless arrest of Appellee and conduct a warrantless search of the vehicle.

Our review of a Commonwealth appeal from an order granting a motion to suppress is well-established:

> When the Commonwealth appeals a suppression order, we consider only the evidence from [Appellee's] witnesses together with the portion of the Commonwealth's evidence which is uncontroverted.  Our standard of review is limited to determining whether the suppression court's factual findings are supported by the record, but we exercise *de novo* review over the suppression court's conclusions of law.

*Commonwealth v. Snyder*, 599 Pa. 656, 963 A.2d 396, 400 (2009) (citations omitted). Further, "[a]ppellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress." *Commonwealth v. Stilo*, 138 A.3d 33, 35–36 (Pa.Super. 2016) (citation omitted). "It is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Gallagher*, 896 A.2d 583, 585 (Pa.Super. 2006) (quotation marks and quotation omitted).

With regard to the Commonwealth's first specific claim, that Officer McNamara was permitted to stop Appellee's vehicle for a violation of 75 Pa.C.S.A. § 4524(e),[2] pertaining to sun screening and other materials prohibited, we note the following relevant legal precepts.

_____

[2] The Motor Vehicle Code relevantly provides the following:
**§ 4524. Windshield obstructions and wipers**
*** *
**(e) Sun screening and other materials prohibited.--**
(1) No person shall drive any motor vehicle with any sun screening device or other material which does not permit a person to see or view the inside of the vehicle through the windshield, side wing or side window of the vehicle.
75 Pa.C.S.A. § 4524(e)(1) (bold in original).

Our analysis of the quantum of cause required for a traffic stop begins with 75 Pa.C.S.A.§ 6308(b),[3] which provides:

> **(b) Authority of police officer.—**Whenever a police officer is engaged in a systematic program of checking vehicles or drivers or has reasonable suspicion that a violation of this title is occurring or has occurred, he may stop a vehicle, upon request or signal, for the purpose of checking the vehicle's registration, proof of financial responsibility, vehicle identification number or engine number or the driver's license, or to secure such other information as the officer may reasonably believe to be necessary to enforce the provisions of this title.

75 Pa.C.S.A. § 6308(b) (bold in original).

"Traffic stops based on a reasonable suspicion: either of criminal activity or a violation of the Motor Vehicle Code under the authority of Section 6308(b) must serve a stated investigatory purpose." *Commonwealth v. Feczko*, 10 A.3d 1285, 1291 (Pa.Super. 2010) (*en banc*) (citation omitted). For a stop based on the observed violation of the Vehicle Code or otherwise non-investigable offense, an officer must have probable cause to make a constitutional vehicle stop. *Feczko*, 10 A.3d at 1291 ("Mere reasonable suspicion will not justify a vehicle stop when the driver's detention cannot serve an investigatory purpose relevant to the suspected violation."). Pennsylvania law makes clear that a police officer has

---

[3] The issue of what quantum of cause a police officer must possess in order to conduct a vehicle stop based on a possible violation of the Motor Vehicle Code is a question of law, over which our scope of review is plenary and our standard of review is *de novo*. *Commonwealth v. Chase*, 599 Pa. 80, 960 A.2d 108 (2008).

probable cause to stop a motor vehicle if the officer observes a traffic code violation, even if it is a minor offense. **Commonwealth v. Chase**, 599 Pa. 80, 960 A.2d 108 (2008).

In the case *sub judice*, the suppression court accepted the uncontradicted evidence that Appellee's vehicle's windows were darkly tinted in violation of 75 Pa.C.S.A. § 4524(e). **See** Suppression Court Opinion, filed 6/19/17, at 3, 7. The suppression court further suggested that, generally, under such circumstances, Officer McNamara would have had probable cause to stop Appellee's vehicle on this basis. **See id.** However, the suppression court concluded that "the stop for illegal tint was merely a pretext to stop the vehicle until it could be searched[,]" and such a stop is impermissible. **Id.** It is with the suppression court's latter conclusion that we disagree.

Since an investigation following the traffic stop would have provided Officer McNamara with no additional information as to whether Appellee violated Section 4524(e), probable cause was necessary to initiate the stop on this basis. **Feczko**, **supra**. As the suppression court found, there is no dispute that Appellee's vehicle's windows were darkly tinted, in violation of Section 4524(e), and that Officer McNamara observed the violation. Accordingly, contrary to the suppression court, we conclude that Officer McNamara was permitted to stop Appellee's vehicle on this basis. **See Chase**, **supra**.

To the extent the suppression court concluded that Officer McNamara's stop of Appellee's vehicle was improper since it was merely a pretext to investigate potential drug crimes, we note that our United States Supreme Court has held that any violation of the Motor Vehicle Code legitimizes a stop, even if the stop is merely a pretext for an investigation of some other crime. *See Whren v. U.S.*, 517 U.S. 806, 812-13 (1996) (establishing a bright-line rule that any technical violation of a traffic code legitimizes a stop, even if the stop is merely a pretext for an investigation of some other crime); *Chase*, *supra* (indicating that if the police can articulate the necessary quantum of cause a constitutional inquiry into the officer's motive for stopping the vehicle is unnecessary). This is true even if, as in the instant case, the Vehicle Code violation witnessed by the officer is a minor offense. *Chase*, 599 Pa. at 89, 960 A.2d at 113 (stating that "[t]he Fourth Amendment does not prevent police from stopping and questioning motorists when they witness or suspect a violation of traffic laws, even if it is a minor offense.") (citation omitted)).

Thus, we conclude the suppression court erred in holding that Officer McNamara's stop of Appellee's vehicle for a violation of Section 4524(e) was improper. Simply put, having accepted the uncontradicted evidence that Appellee's vehicle's window tinting violated Section 4524(e), and the officer observed the traffic violation, the suppression court should not have examined the officer's subjective motive for stopping Appellee's vehicle.

Having concluded Officer McNamara had probable cause to stop Appellee's vehicle, we address the Commonwealth's next two specific claims, which are interrelated: that Officer McNamara was permitted to ask Appellee a few questions during the traffic stop, as well as ask him to exit the vehicle, and based on the totality of the circumstances, Officer McNamara had reasonable suspicion to detain Appellee and conduct a K-9 sniff of the vehicle's exterior after the initial traffic stop.

As the Commonwealth notes, the suppression court held that, after making "a stop for a motor vehicle violation [ ] it only can go in the direction that a motor vehicle stop is permitted to go." N.T., 4/24/17, at 71. Further, the suppression court held that, even if Officer McNamara was permitted to stop Appellee's vehicle for a violation of Section 4524(e), Officer McNamara's "only remaining duty was to issue a citation [for the traffic offense], not place [Appellee] in handcuffs and detain him." Suppression Court Opinion, filed 6/19/17, at 7. We disagree with the suppression court's analysis and conclusions in this regard.

> During a traffic stop, the officer "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." **Berkemer v. McCarty**, 468 U.S. 420, 439 (1984). "[I]f there is a legitimate stop for a traffic violation. . .additional suspicion may arise before the initial stop's purpose has been fulfilled; then, detention may be permissible to investigate the new suspicions." **Chase**, 599 Pa. 80, 960 A.2d [at] 115 n.5.

**Commonwealth v. Valdivia**, 145 A.3d 1156, 1162 (Pa.Super. 2016), *appeal granted*, 165 A.3d 869 (Pa. 2017).

Moreover, it is well-established that "when an officer detains a vehicle for violation of a traffic law, it is inherently reasonable that he or she be concerned with safety and, as a result, may order the occupants of the vehicle to alight from the car." ***Commonwealth v. Rosas***, 875 A.2d 341, 348 (Pa.Super. 2005) (quotation and quotation marks omitted). ***See Commonwealth v. Pratt***, 930 A.2d 561, 564 (Pa.Super. 2007) (noting that "following a lawful traffic stop, an officer may order [ ] the driver. . .of a vehicle to exit the vehicle until the traffic stop is completed, even absent a reasonable suspicion that criminal activity is afoot.").

Furthermore, for their safety, police officers may handcuff individuals during an investigative detention.[4]  ***See Rosas***, ***supra***. Additionally, our

_____

[4] As our Supreme Court has held:
> Fourth Amendment jurisprudence has led to the development of three categories of interactions between citizens and the police. The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond.  The second, an "investigative detention[,]" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest.  Finally, an arrest or "custodial detention" must be supported by probable cause.

***Commonwealth v. Ellis,*** 541 Pa. 285, 662 A.2d 1043, 1047–48 (1995) (citations omitted).  In the case *sub judice*, we conclude that Appellee, who was handcuffed for approximately fifteen minutes while awaiting the K-9 sniff, and permitted to stand outside of his vehicle, was subjected to an investigative detention for which reasonable suspicion was necessary. ***See Rosas***, 875 A.2d at 348 ("While we acknowledge that [the trooper] ordered [the appellee] out of the car and placed him in handcuffs, such facts, by

*(Footnote Continued Next Page)*

Supreme Court has held that "considering the relatively minor privacy interest in the exterior of the vehicle and the minimal intrusion occasioned by a canine sniff, . . .mere reasonable suspicion, rather than probable cause, [is] required prior to [a dog] sniffing the exterior of [a] vehicle."[5] **Commonwealth v. Rogers**, 578 Pa. 127, 849 A.2d 1185, 1191 (2004).

> We have defined "reasonable suspicion" as follows:
>
> [T]he officer must articulate specific observations which, in conjunction with reasonable inferences derived from these observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot. . .In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. In making this determination, we must give due weight. . .to the specific reasonable inferences [the police officer] is entitled to draw from the facts in light of his experience.  Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

**Commonwealth v. Smith**, 917 A.2d 848, 852 (Pa.Super. 2007) (citations omitted).

In the case *sub judice*, in light of the totality of the circumstances, we agree with the Commonwealth that Trooper McNamara had reasonable suspicion to detain Appellee beyond the initial traffic stop and direct a K-9

_(Footnote Continued)_ ─────────────

themselves, do not support the conclusion that [the appellee] was under arrest.").

[5] "A canine sniff is a search pursuant to Article I, Section 8 of the Pennsylvania Constitution." **Commonwealth v. Green**, 168 A.3d 180, 185 (Pa.Super. 2017) (footnote omitted).

sniff of the exterior of Appellee's vehicle. Specifically, the uncontradicted evidence revealed that a CI, who was known to Trooper McNamara and who had assisted him in five past criminal cases, reported that a woman named "Juanita"[6] was planning to purchase crack cocaine from a certain residence on Euclid Avenue from a black male who would be driving a white sedan. While the CI did not know the dealer's name, he knew the dealer would be coming from a gym and then travelling back to Jeanette. The officer and CI agreed upon a pre-arranged signal in the form of a hang-up call to the police dispatcher, which would alert Officer McNamara that the sale was completed and the dealer was leaving the area.

Officer McNamara testified he received the pre-arranged signal and less than thirty seconds later he saw a white sedan being driven by a black male leaving Euclid Avenue. As indicated *supra*, Officer McNamara followed the vehicle, and observing the window tint violation, he properly initiated a stop of the vehicle on this basis. **See Chase**, **supra**.

During the traffic stop, consistent with the CI's information, Appellee informed the officer that he was "coming from the gym and he was going to go back home towards Jeannette." N.T., 4/24/17, at 12. Further, Appellee denied being on Euclid Avenue, even though Officer McNamara advised him

_____

[6] It is uncontradicted that the CI had previously provided information to Trooper McNamara, which had resulted in a successful prosecution as to Juanita.

- 22 -

that he had just followed him from Euclid Avenue. Moreover, when Officer McNamara asked Appellee to exit his vehicle, as the officer was permitted to do, **see Rosas**, **supra**, Appellee twice refused, resulting in Officer McNamara grabbing Appellee's arm and removing him from the vehicle.

Based on the aforementioned, including the CI's tip, Appellee's answers to Officer McNamara's limited questions, and Appellee's refusal to alight from his vehicle, we agree with the Commonwealth that Officer McNamara "articulate[d] specific observations which, in conjunction with reasonable inferences derived from these observations, led him reasonably to conclude, in light of his experience, that criminal activity was afoot." **Smith**, 917 A.2d at 852. Thus, Officer McNamara had reasonable suspicion to detain Appellee and direct a K-9 sniff of the exterior of his vehicle. **See Commonwealth v. Johnson**, 849 A.2d 1236, 1238 (Pa.Super. 2004) ("We also conclude that based on the information given by a CI who had proven to be reliable in the past, when a man fitting the description arrived at the appointed location in a car similar to the one that had been described by the CI, the police had reasonable suspicion that criminal activity was afoot."); **Commonwealth v. Gray**, 784 A.2d 137, 141-42 (Pa.Super. 2001) (holding that among the factors to be considered in establishing a basis for reasonable suspicion are tips, the reliability of the informant, and suspicious activity).

Finally, we address the Commonwealth's remaining specific argument, that following the K-9 sniff Officer McNamara had probable cause to conduct a warrantless search of the vehicle and make a warrantless arrest of Appellee. As to this issue, in addition to finding a lack of probable cause, the suppression court held that Officer McNamara was required to secure a warrant prior to searching the subject vehicle. We disagree with the suppression court.

It is well-settled that a warrantless arrest must be supported by probable cause. *In re J.G.*, 145 A.3d 1179 (Pa.Super. 2016). Moreover, police may search an automobile without a warrant so long as they have probable cause to do so, as an automobile search "does not require any exigency beyond the inherent mobility of a motor vehicle." *Commonwealth v. Gary*, 625 Pa. 183, 91 A.3d 102, 104 (2014).[7] Our

---

[7] As this Court has held:

> *Gary* is technically a plurality decision. Former Justice Orie Melvin did not participate in the consideration or decision of the case, which led to a decision by only six justices of the Court. Justice McCaffery wrote the opinion announcing the judgment of the Court, which Chief Justice Castille and Justice Eakin joined. Justice Todd wrote a dissent that Justice Baer joined. Justice Saylor, however, wrote a concurrence, in which he "join[ed] the lead Justices in adopting the federal automobile exception." *Gary*, 91 A.3d at 138 (Saylor, J., concurring). Therefore, *Gary* is binding precedent on this Court with respect to Pennsylvania's adoption of the federal automobile exception to the warrant requirement.

*Commonwealth v. Green*, 168 A.3d 180, 187 (Pa.Super. 2017).

Supreme Court has concluded that Article I, Section 8 of the Pennsylvania Constitution is co-extensive with the Fourth Amendment to the United States Constitution, which has long supported a warrant exception for automobile searches so long as probable cause to search exists. *See id.* at 108–13.

With respect to probable cause to search, our Supreme Court instructs us that:

> [p]robable cause exists where the facts and circumstances within the officers' knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed. With respect to probable cause, this [C]ourt adopted a "totality of the circumstances" analysis in *Commonwealth v. Gray*, 509 Pa. 476, 503 A.2d 921, 926 (1985) (relying on *Illinois v. Gates*, 462 U.S. 213 [103 S.Ct. 2317, 76 L.Ed.2d 527] (1983)). The totality of the circumstances test dictates that we consider all relevant facts, when deciding whether [the officer had] probable cause.

*Commonwealth v. Luv*, 557 Pa. 570, 735 A.2d 87, 90 (1999) (some citations and quotations omitted).

In the case *sub judice*, in considering the totality of the circumstances, we agree with the Commonwealth that Officer McNamara had probable cause to conduct a warrantless search of Appellee's vehicle. In addition to the factors discussed extensively *supra*, Officer McNamara testified the K-9 sniff of the exterior of the vehicle positively alerted the police to contraband being inside the vehicle, the passenger compartment of which Officer McNamara could not see because of the illegally tinted windows. *See Luv*, *supra* (defining probable cause). Accordingly, we conclude Officer

- 25 -

McNamara properly searched Appellee's vehicle without a warrant and, upon discovering the handgun, had probable cause to arrest Appellee.[8]

For all of the foregoing reasons, we conclude the suppression court erred in granting Appellee's motion to suppress.[9]  Accordingly, we reverse the suppression court's order and remand for proceedings consistent with this decision.

Order Reversed; Case remanded; Jurisdiction relinquished.

Judge Bowes joins the Opinion.

Judge Ransom notes dissent.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  12/20/2017

---

[8] Appellee was subsequently properly searched incident to the arrest. **Commonwealth v. Simonson**, 148 A.3d 792 (Pa.Super. 2016) (holding a defendant may be searched incident to an arrest).

[9] It is noteworthy that the cases relied upon and analyzed by the suppression court in granting Appellee's motion to suppress are distinguishable from the instant case in which Appellee's vehicle was properly stopped for a motor vehicle violation.  For instance, in **In re O.A.**, **supra**, the issue was whether the police had probable cause to make a warrantless arrest of a defendant in an abandoned garage based on a CI's tip; in **Stokes**, **supra**, the issue was whether the police had probable cause to make a warrantless arrest of a defendant at his home based on a tip; and in **Clark**, **supra**, the issue was whether the police had probable cause for a search warrant based on a tip from a CI.