2019 PA Super 358

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DAVON MARKIEM WRIGHT | : | |
| | : | |
| Appellant | : | No. 2991 EDA 2018 |

Appeal from the Judgment of Sentence Entered June 7, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001903-2017

BEFORE:   BOWES, J., OLSON, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.:                **FILED DECEMBER 19, 2019**

Appellant, Davon Markiem Wright, appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County following his conviction by a jury on the charges of possession of firearm prohibited, firearms not to be carried without a license, carrying firearms in public in Philadelphia, and unlawful body armor.[1]  After a careful review, we affirm.

The relevant facts and procedural history are as follows: Following his arrest, Appellant filed a counseled omnibus pre-trial motion seeking the suppression of physical evidence seized by the police.  Specifically, Appellant averred the police lacked reasonable suspicion or probable cause to detain

---

[*] Former Justice specially assigned to the Superior Court.
[1] 18 Pa.C.S.A. §§ 6105(a)(1), 6106(a)(1), 6108, and 907(c), respectively.

him beyond what was necessary to effectuate a routine traffic stop. The matter proceeded to a suppression hearing on July 18, 2017, at which Philadelphia Police Officer John Lang was the sole testifying witness.

Officer Lang, who has been a police officer for over eleven years, testified that, on February 14, 2017, he and his partner were dispatched to Club Onyx on South Columbus Boulevard to investigate threats made against the club. N.T., 7/18/17, at 7-9, 15. Club Onyx is in an area where "numerous shootings" and "a few homicides" have occurred. *Id.* at 15-16. As the officers were driving a marked police cruiser to the club, at approximately 11:20 p.m., they observed a black Hyundai parked a short distance from the club in one of the two southbound travel lanes of Columbus Boulevard. *Id.* at 9-10. The officers did not effectuate a stop of the Hyundai, but continued to the club to perform their investigation. *Id.* at 10.

The officers were in the club for approximately thirty to forty-five minutes, and when they left, they travelled northbound on Columbus Boulevard. *Id.* As they drove away from the club, they noticed the same black Hyundai was still parked in the same southbound travel lane of Columbus Boulevard. *Id.* at 10-12.

At this point, the officers drove their police vehicle across the island between the northbound and southbound lanes and parked in front of the black Hyundai so that the vehicles came "bumper to bumper" with each other. *Id.* at 10. Officer Lang testified they "indicate[d] a traffic stop" because the

black Hyundai was parked near the club where they were investigating the threat offenses, and additionally, the vehicle was parked in a lane of travel as opposed to being in a proper parking spot. *Id.* at 10-11. Officer Lang noted that people are not "allowed to park in that lane[,]" and "it's very hazardous to…park there." *Id.* at 11.

Officer Lang testified that, after he and his partner initiated the traffic stop, he approached the driver's side of the black Hyundai while his partner approached the passenger's side. *Id.* at 12. Appellant was sitting in the driver's seat; there were no passengers in the black Hyundai. *Id.* Officer Lang testified he approached Appellant and asked him for his license, registration, and insurance card. *Id.* He also asked Appellant why he was parked in the travel lane, and Appellant responded that he was "using his cell phone[.]" *Id.* Officer Lang testified he had not seen Appellant using his cell phone. *Id.* at 12-13. Officer Lang indicated that at this point in the interaction, Appellant, who was wearing tactical pants, used his left hand to grab towards a small pocket on his left pant leg while his right hand went towards the gearshift in the center console. *Id.* at 13.

Believing Appellant was going to drive away, Officer Lang and his partner repeatedly requested that Appellant exit the vehicle, and despite Appellant saying "I am, I am, I am[,]" Appellant made no move to exit the vehicle. *Id.* at 13-14. Instead, Appellant continued to reach for the gearshift. *Id.* at 14. Officer Lang opened the driver's side door and, at this point, he

noticed Appellant was wearing a ballistic vest with a police-style insignia or badge indicating "agent." *Id.* Appellant was also wearing a thin, partially unzipped windbreaker over the vest. *Id.* Officer Lang observed that the front center pocket of the windbreaker was "very weighted down," and based on his training, he believed there was a firearm in the pocket. *Id.* at 14-15. Appellant continued to resist exiting the black Hyundai while reaching for the gearshift, so Officer Lang, who feared for his safety, with the assistance of his partner, forcibly removed Appellant from the black Hyundai. *Id.* at 15, 20.

After they removed Appellant from the vehicle, they put him face-down on the ground, and Officer Lang "hear[d] a clanking sound when [Appellant] hit the ground." *Id.* at 21. Officer Lang believed the "clanking sound" was the sound of a gun hitting the ground. *Id.* Officer Lang indicated that Appellant would not put his hands behind his back but kept them underneath his body. *Id.* When Officer Lang reached under Appellant to grab his hands, he felt the firearm. *Id.* The officer took the firearm, which was a loaded Glock 19, and slid it underneath the parked black Hyundai so that it was out of everyone's reach. *Id.* at 22. Appellant was then successfully handcuffed. *Id.*

Officer Lang testified the police seized from Appellant's person the ballistics vest, a PA certified badge, a bail enforcement badge, a Philadelphia permit to carry a firearm, a certified agent identification card, and a laminated bail enforcement identification card. *Id.* at 23. Officer Lang later determined that Appellant's permit to carry a firearm was not valid. *Id.*

At the conclusion of the hearing, the suppression court denied Appellant's suppression motion, and on March 26, 2018, a jury convicted Appellant of the offenses indicated *supra*. On June 7, 2018, the trial court sentenced Appellant to eight years to sixteen years in prison, to be followed by eighteen months of probation, for possession of a firearm prohibited; three years to six years in prison, to be followed by eighteen months of probation, for firearms not to be carried without a license; and three years to six years in prison, to be followed by eighteen months of probation, for unlawful body armor. The sentences were imposed concurrently to each other; no further penalty was imposed for carrying firearms in public in Philadelphia.

Appellant filed a timely, counseled motion for reconsideration of sentence, which was denied by operation of law on October 5, 2018. On October 16, 2018, Appellant filed a timely, counseled notice of appeal.[2]

---

[2] On October 18, 2018, recognizing its eighteen month probationary tail on the firearms not to be carried without a license and unlawful body armor convictions clearly exceeded the statutory maximum, the trial court entered an amended sentencing order to reflect that the probationary tail had been reduced to twelve months with regard to each conviction. We note the Pennsylvania Supreme Court has recognized that the trial court possesses the inherent jurisdiction to correct "patent and obvious mistakes" beyond the general rule set forth in 42 Pa.C.S.A. § 5505 and Pa.R.A.P. 1701. **See Commonwealth v. Holmes**, 593 Pa. 601, 933 A.2d 57, 66-67 (2007) (holding the trial court may correct a sentence that is illegal on its face notwithstanding the time limits set forth in Section 5505 and despite the fact an appeal is pending).

On appeal, Appellant contends the suppression court erred in denying his motion to suppress the physical evidence seized by Officer Lang. Specifically, while Appellant does not challenge the validity of the initial traffic stop,[3] he contends that "the stop was only permitted to last as long as necessary to issue a traffic citation[, but] the officer[s] detained Appellant for longer than necessary and conducted a search of Appellant…without reasonable suspicion." Appellant's Brief at 7.

Our standard of review of the denial of a motion to suppress evidence is as follows:

> [An appellate court's] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where…the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on [the] appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the [trial court are] subject to plenary review.

_____

[3] In any event, as the suppression court noted, the officers were permitted to effectuate a traffic stop due to Appellant's violation of 75 Pa.C.S.A. § 3351, pertaining to parking a vehicle on the roadway. ***See Commonwealth v. Bozeman***, 205 A.3d 1264 (Pa.Super. 2019) (discussing Section 3351).

*Commonwealth v. Hoppert*, 39 A.3d 358, 361-62 (Pa.Super. 2012).

Moreover, "[a]ppellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress." *Commonwealth v. Stilo*, 138 A.3d 33, 35-36 (Pa.Super. 2016) (citation omitted)). Also, "[i]t is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." *Commonwealth v. Gallagher*, 896 A.2d 583, 585 (Pa.Super. 2006) (quotation marks and quotation omitted).

It is well-settled that, during a traffic stop, the officer "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). *See Commonwealth v. Harris*, 176 A.3d 1009 (Pa.Super. 2017). Moreover, during "a lawful traffic stop, the officer may order [] the driver…of a vehicle to exit the vehicle until the traffic stop is completed, even absent a reasonable suspicion that criminal activity is afoot." *Commonwealth v. Pratt*, 930 A.2d 561, 564 (Pa.Super. 2007). *See Commonwealth v. Dunham*, 203 A.3d 272 (Pa.Super. 2019) (noting a police officer conducting a lawful traffic stop may order the driver to get out of the car); *Commonwealth v. Campbell*, 862 A.2d 659 (Pa.Super. 2004) (holding that during a routine traffic stop the police may request the driver exit the vehicle as a matter of course). We have recognized that "'when an officer detains a vehicle for violation of a traffic law, it is inherently

reasonable that he or she be concerned with safety and, as a result, may order the occupants of the vehicle to alight from the car.'" **Harris**, 176 A.3d at 1009 (quoting **Commonwealth v. Rosas**, 875 A.2d 341, 348 (Pa.Super. 2005)). "[A]llowing police officers to control all movement in a traffic encounter…is a reasonable and justifiable step towards protecting their safety." **Pratt**, 930 A.2d at 567-68.

Further, "if there is a legitimate stop for a traffic violation…additional suspicion may arise before the initial stop's purpose has been fulfilled; then, detention may be permissible to investigate the new suspicions." **Commonwealth v. Chase**, 599 Pa. 80, 960 A.2d 108, 115 n.5 (2008). "[F]or their safety, police officers may handcuff individuals during an investigative detention." **Harris**, 176 A.3d at 1021 (footnote and citation omitted).

Additionally, the officer may conduct a pat-down of a suspect's outer garments if the officer observes conduct that leads him to reasonably believe the suspect may be armed and dangerous. **Commonwealth v. Mack**, 953 A.2d 587, 590 (Pa.Super. 2008) (noting officer's observation of suspect's reaching movements while suspect was in vehicle can lead officer to reasonably conclude his safety is in jeopardy). In considering whether evidence supports a **Terry**[4] frisk, we are "guided by common sense concerns, giving preference to the safety of the officer during an encounter with a

---

[4] **Terry v. Ohio**, 392 U.S. 1, 88 S.Ct. 1868 (1968).

suspect where circumstances indicate that the suspect may have, or may be reaching for, a weapon." **Mack**, 953 A.2d at 590. "In order to establish reasonable suspicion, the police officer must articulate specific facts from which he could reasonably infer that the individual was armed and dangerous." **Id.** When assessing the validity of a **Terry** frisk, we examine the totality of the circumstances. **Commonwealth v. Zhahir**, 561 Pa. 545, 751 A.2d 1153 (2000).

Here, as the suppression court aptly noted, upon effectuating the lawful traffic stop, Officer Lang approached Appellant, who was sitting in the driver's seat of the black Hyundai, and asked Appellant for his license, registration, and insurance card, as well as Appellant's purpose for parking in the travel lane of Columbus Boulevard. We conclude these questions were all properly part of Officer Lang's investigation of the initial traffic stop. **See Harris**, **supra**.

During this initial interaction, Appellant responded that he was parked in the road because he was using his cell phone. Officer Lang noticed Appellant kept reaching his left hand towards a pocket on his left pant leg while Appellant's right hand kept reaching towards the gearshift in the center console. Officer Lang testified he asked Appellant to exit the vehicle at this juncture because he was concerned Appellant was going to drive way. We conclude that, even assuming, *arguendo*, Officer Lang did not have reasonable suspicion to think criminal activity beyond the initial traffic stop was afoot, he

was permitted to order Appellant to exit the vehicle as a matter of course in connection with the initial traffic stop, which was still ongoing. **See Dunham**, **supra**; **Pratt**, **supra**; **Campbell**, **supra**.

Officer Lang testified that, at this point, despite repeated requests, Appellant made no move to exit the vehicle and, instead, he kept reaching for the gearshift. Accordingly, Officer Lang opened the driver's side door. This was legally permissible. **See Commonwealth v. Thorne**, 191 A.3d 901 (Pa.Super. 2018).

As soon as he opened the car door, Officer Lang noticed Appellant was wearing a ballistic vest with some kind of badge, as well as a thin windbreaker which appeared to be "very weighted down" in the front pocket. Based on his training, Officer Lang believed the "heavy" item to be a handgun. Further, Officer Lang testified Appellant resisted exiting the black Hyundai while continuing to reach toward the gearshift, thus Officer Lang and his partner forcibly removed Appellant from the vehicle.

Even assuming, *arguendo*, as Appellant argues, Officer Lang was not permitted to forcibly remove Appellant from the vehicle as a matter of course in connection with the initial traffic stop, we agree with the suppression court that additional reasonable suspicion arose such that Officer Lang was permitted to forcibly remove Appellant from the vehicle. **See Mack**, **supra**. Simply put, under the totality of the circumstances, Officer Lang had reasonable suspicion to believe that Appellant was armed and dangerous such

that he could remove Appellant from the vehicle to conduct a pat-down for weapons. **See id**.

Thereafter, as Appellant continued to struggle, Officer Lang heard a "clanking sound" when Appellant was placed face-down on the ground, and when the officer reached under Appellant, he felt the firearm. Officer Lang properly seized the firearm at this juncture. **See Harris**, **supra**; **Mack**, **supra**. Further, upon seizing the gun, Officer Lang had probable cause to arrest, as well as search Appellant's person incident to the arrest. **See Commonwealth v. Simonson**, 148 A.3d 792 (Pa.Super. 2016) (explaining probable cause to arrest and "search incident to arrest" exception). Accordingly, we conclude the suppression court properly denied Appellant's motion to suppress.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>12/19/19</u>