J-S40022-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LOUIS BURTON | : | |
| | : | |
| Appellant | : | No. 335 EDA 2023 |

Appeal from the Judgment of Sentence Entered October 6, 2022
In the Court of Common Pleas of Delaware County
Criminal Division at No(s):  CP-23-CR-0004219-2018

BEFORE:   NICHOLS, J., SULLIVAN, J., and COLINS, J.[*]

MEMORANDUM BY SULLIVAN, J.:                    **FILED JULY 17, 2024**

Louis Burton appeals from the judgment of sentence imposed after a jury found him guilty of firearms not to be carried without a license and possession of firearms prohibited (collectively, "the firearms offenses").[1]  We affirm.

The trial court summarized the factual history of this appeal as follows:

> [I]n May [] 2018, Officer Luke McCann [("Officer McCann")] of the Upland Borough Police Department observed [Burton] walking across Upland Avenue in the middle of a block instead of at a crosswalk.  Officer McCann continued to observe [Burton,] and saw him cross the intersection of Upland Avenue and Medical Center Boulevard in violation of the electronic pedestrian control signal.  Officer McCann approached [Burton] in his patrol vehicle. [Officer McCann exited his vehicle].  Officer McCann requested [Burton] approach the patrol vehicle so McCann could speak with

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** 18 Pa.C.S.A. §§ 6106, 6105.  The Commonwealth charged the count of possession of firearms prohibited as a first-degree felony.  **See** Information, 8/8/18, unnumbered at 4.

him. [Burton] failed to comply with the request and continued moving away from the officer. Officer McCann and fellow Upland Borough Police Officer Daniel Lemmon [("Officer Lemmon")] began to pursue [Burton.] Corporal Joseph Hughes [("Corporal Hughes")] of the Chester Township Police Department joined in the pursuit. There were allegations that [Burton] fired a shot at the officers with a handgun as he was fleeing [and Officer McCann and Corporal Hughes returned fire.[2]] [Edward Mace ("Mace") was inside his home at the time and heard two gunshots, one from a smaller caliber firearm and then one from a larger caliber firearm.] The chase ended when Corporal Hughes fired his service weapon striking [Burton] and knocking him to the ground. Next to [Burton], police found a 9mm handgun. The evidence presented at trial established that [Burton] did not have a permit to carry a firearm, and in addition that [Burton], as a result of his criminal history, is prohibited from possessing a firearm.

Trial Court Opinion, 4/5/23, at 4-5 (footnote omitted).

The Commonwealth charged Burton with the firearms offenses and nine counts for shooting at the officers. Burton filed a motion to suppress alleging he was unlawfully detained. The trial court denied the motion after a hearing. In August 2021, a jury acquitted Burton of four of the nine counts for shooting at the officers, but it could not reach verdicts on the remaining counts.

In July 2022, Burton proceeded to a second trial. Of relevance to this appeal, we briefly note the trial court overruled Burton's objection to verdict sheets, which included language referring to a firearm "within [Burton's] reach." N.T., 7/6/22, at 7-9; *see also* N.T., 7/11/22, at 98. The Commonwealth, over Burton's objection, also presented Mace's testimony about the possible calibers of the firearms he heard firing. *See* N.T., 7/7/22,

---

[2] The trial evidence established that Officer McCann and Corporal Hughes fired numerous shots from their .45 caliber service pistols at different points during the chase of Burton. *See* N.T. 7/7/22, at 165-66; N.T., 7/8/22, at 58, 66-67.

at 55-64. During its charge, the trial court misspoke when discussing consciousness of guilt evidence, immediately corrected its error, and properly informed the jury that it could not find Burton guilty based solely on evidence of his flight from Officer McCann. *See* N.T., 7/11/22, at 253-54.

The jury found Burton guilty of the firearms offenses[3] and not guilty of the remaining counts. The trial court subsequently imposed consecutive sentences on the firearms offenses, resulting in an aggregate term of nine to eighteen years of imprisonment. Burton filed a timely post-sentence motion for reconsideration of the sentence, which the trial court denied. Burton timely appealed, and both he and the trial court complied with Pa.R.A.P. 1925.

Burton raises the following issues for our review:

[1.] Did the trial court err in denying [Burton's] motion to suppress evidence?

[2.] Did the trial court err in a[llowing] a lay witness to testify to the sounds of gunshots and possible calibers?

[3.] Was the verdict slip submitted to the jury misleading?

[4.] Did the trial court err in providing a jury instruction without a curative instruction?

[5.] Did the trial court err in imposing . . . sentence . . .?

Burton's Brief at 5.

In his first issue, Burton challenges the denial of his motion to suppress. *See* Burton's Brief at 13-16.

_____

[3] The court bifurcated the charge of possession of firearms prohibited.

We summarize the background of the trial court's suppression ruling from the record. Burton filed an omnibus pretrial motion asserting that he was improperly and illegally detained and arrested. *See* Omnibus Pretrial Motion, 11/8/19, unnumbered at 2 (asserting that Burton's arrest "was based upon an improper and illegal detention of [his] person which was conducted without probable cause"). The trial court held a hearing at which Officer McCann testified.

The trial court thereafter entered the following findings of fact:

5. On May 10, 2018[,] while on patrol in a marked police vehicle, Officer McCann approached the intersection of Upland Avenue and Medical Center Boulevard in Upland Borough, Delaware County, Pennsylvania.

6. Officer McCann described this location as "busy" with a heavy traffic pattern including emergency vehicles.

7. At approximately 7:30 p.m. . . ., Officer McCann observed two (2) males illegally cross Upland Avenue mid-block, outside of any delineated cross-walk.

8. This activity drew Office McCann's attention due to the high level of vehicular traffic including emergency vehicles and the close proximity of an ambulance entrance to Crozer Chester Medical Center on Medical Center Boulevard.

9. Officer McCann continued to monitor the two (2) males and observed them cross the intersection of Upland Avenue and Medical Center Boulevard in violation [of] an electronic pedestrian control device.

10. At this juncture, Officer McCann parked his marked patrol vehicle on Presidents Drive and activated the unit's in-car camera.

11. Officer McCann requested the two (2) males speak with him. One responded that it was raining and they simply wanted to get home.

12. It was Officer McCann's intention to advise these individuals of the pedestrian violations he observed.

13. Officer McCann was joined by Officer Lemmon . . .. Officer Lemmon parked his marked police unit directly behind Officer McCann's vehicle on Presidents Drive.

14. Officer McCann identified . . . Burton as one [of] the two males he hailed on May 10, 2018. . . .

15. . . . Burton began to withdraw onto Upland Avenue as Officer McCann approached.

16. As . . . Burton retreated he made furtive movements including reaching towards the area of his waistband and jacket on two or three (2 or 3) separate occasions.

17. Officer McCann directed . . . Burton to show his hands[,] at which point . . . Burton removed his hands from his jacket and lit a cigarette while standing in the middle of Upland Avenue.

18. . . . Burton again returned his hands to his pocket.

19. Officer McCann repeated his request for . . . Burton to approach the police vehicle and remove himself from the middle of Upland Avenue.

20. . . . Burton once again returned his hands to the area of his waistband and jacket, abruptly turned[,] and fled in what Officer McCann described as a full sprint.

21. Officer McCann pursued . . . Burton with Officer Lem[m]on trailing.

22. . . . Burton fled north into a driveway directly across from Presidents Drive. He then made turned [sic] onto West 21st Street running from the 400 block to the 300 block.

23. At this point in his pursuit, Officer McCann was seven (7) to eight (8) feet away from . . . Burton.

24. . . . Burton next turned left into an alley between the 400 block and 300 block of West 21st Street.

25. Officer McCann provided verbal commands to halt and further notified . . . Burton[,] should he fail to stop[, that] a taser would be discharged.

26. . . . Burton failed to heed the warning and Officer McCann ultimately discharged his taser. Officer McCann estimates he was no more twenty (20) feet from . . . Burton when he discharged the taser. Officer McCann believes only one prong of the taser struck . . . Burton.

27. Simultaneously with the discharge of Officer McCann's taser, . . . Burton withdrew a black handgun from his waistband, reached behind himself and fired one round at Officer McCann.

28. The round struck no more than five to seven (5-7) feet in front of Officer McCann's position.

Order, 10/17/19, at 3-6 (citations to record and footnote omitted).

The trial court determined that Officer McCann observed Burton improperly cross the road in violation of 75 Pa.C.S.A. §§ 3541 (obedience of pedestrians to traffic-control devices and regulations) and 3543 (pedestrians crossing at other than crosswalks).[4] **See id**. at 12-14. Those observations, the court noted, provided the officer with the authority to stop and detain Burton. **See id**. at 14. The court thus concluded that Officer McCann had a lawful basis to detain Burton and denied Burton's motion to suppress. **See id**.

When reviewing the trial court's denial of a motion to suppress,

[o]ur standard of review . . . is limited to determining whether the findings of fact are supported by the record and whether the legal conclusions drawn from those facts are in error. In making this determination, this Court may only consider the evidence of the Commonwealth's witnesses, and so much of the witnesses for the defendant, as fairly read in the context of the record as a whole, which remains uncontradicted. If the evidence supports the findings of the trial court, we are bound by such findings and may

---

[4] Violations of section 3541 and 3543 are summary offenses. **See** 75 Pa.C.S.A. § 3552.

reverse only if the legal conclusions drawn therefrom are erroneous.

*Commonwealth v. Gindraw*, 297 A.3d 848, 851 (Pa. Super. 2023) (internal citation and brackets omitted). The scope of review is limited to the suppression hearing record. *See In re L.J.*, 79 A.3d 1073, 1085 (Pa. 2013). "With respect to a suppression court's factual findings, it is the sole province of the suppression court to weigh the credibility of the witnesses. Further, the suppression court judge is entitled to believe all, part or none of the evidence presented." *Commonwealth v. Heidelberg*, 267 A.3d 492, 499 (Pa. Super. 2021) (internal citation and quotations omitted).

"Article I, § 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution both protect the people from unreasonable searches and seizures." *Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014) (internal citation omitted). A seizure occurs when the totality of the circumstances show an officer has restrained a person by physical force or show of coercive authority such that a reasonable person would not feel free to leave. *See id*.

Subject to specifically established exceptions, a warrantless seizure of a person is presumptively unreasonable. *See Interest of T.W.*, 261 A.3d 409, 416 (Pa. 2021). One such exception is a "*Terry* stop," or an investigative

detention,[5] which permits an officer to detain a person based on reasonable suspicion that the person is or has committed a criminal offense. *Id*. at 417.

The law governing *Terry* stops informs investigative detentions to enforce the Vehicle Code. *See Commonwealth v. Feczko*, 10 A.3d 1285, 1291 (Pa. Super. 2010) (*en banc*). The quantum of suspicion to detain a person depends on the officer's need to investigate a suspected violation of the Vehicle Code. *See id*. Where a stop would serve no investigatory purposes relevant to the suspected violation, an officer must have probable cause. *See id*. (holding that a stop for failing to drive in a single lane requires probable cause); *accord Commonwealth v. Draine*, 82 EDA 2022, 2023 WL 7181200, at *4-5 (Pa. Super. 2023) (unpublished memorandum) (using a probable cause standard when determining that an officer lawfully stopped a pedestrian who failed to use a sidewalk in violation of 75 Pa.C.S.A. § 3544).[6] If an officer has sufficient cause to stop a person, an inquiry into the officer's subjective or pretextual motives becomes unnecessary. *Commonwealth v.*

---

[5] *See Terry v. Ohio*, 392 U.S. 1 (1968). It is well settled that there are three categories of interaction between police officers and citizens: (1) a mere encounter, which does not require any level of suspicion or carry any official compulsion to stop or respond; (2) an investigative detention, which permits the temporary detention of an individual if supported by reasonable suspicion; and (3) an arrest or custodial detention, which must be supported by probable cause. *See Lyles*, 97 A.3d at 302.

[6] *See* Pa.R.A.P. 126(b) (stating that unpublished non-precedential decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value).

*Harris*, 176 A.3d 1009, 1020 (Pa. Super. 2017). "This is true even if . . . the Vehicle Code violation witnessed by the officer is a minor offense." *Id*. (internal citation omitted).

On appeal, Burton asserts that Officer McCann's attempt to detain him "was not based on reasonable suspicion, but as a pretext to stop and harass [him]." Burton's Brief at 16. He notes Officer McCann observed no suspicious behavior other than Burton's "jaywalking" violations. *Id*. at 13-16. He emphasizes Officer McCann was unsure whether he would issue a citation. *See id*. at 15-16.[7]

The trial court, in its Rule 1925(a) opinion, reiterated that Officer McCann's attempts to stop Burton were lawful. As the court stated, "Officer McCann gave a candid, credible, and detailed description of the two pedestrian violations that he observed prior to initiating the stop. The violations of

_____

[7] Burton did not allege pretext as a basis for relief in his motion to suppress or his Rule 1925(b) statement. *See* Omnibus Pretrial Motion, 11/8/19, unnumbered at 2 (asserting that Officer McCann illegally detained and arrested him); Rule 1925(b) Statement, 2/15/23, unnumbered at 4 (asserting that Officer McCann engaged in an unlawful pedestrian stop and pursuit without evidence of prior criminal activity). However, because a legal stop negates a claim of pretext, *see Harris*, 176 A.3d at 1020, we consider the trial court's conclusion that Officer McCann's attempt to detain Burton for violations of the Vehicle Code was lawful.

Burton also raises factual claims regarding the volume of traffic at the time of the stop and the other officers' views about stopping someone for pedestrian violations. *See* Burton's Brief at 13-16. In so doing, Burton impermissibly relies on citations to the trial evidence. *See In re L.J.*, 79 A.3d 1073, 1085 (Pa. 2013). We limit our review to the evidence presented at the suppression hearing. *See id*.

[sections 3541 and 3543] created probable cause to justify the stop." Trial Court Opinion, 4/5/23, at 5.

Following our review, we conclude the record supports the trial court's findings and that the court committed no error of law. The trial court properly concluded that Officer McCann's observations of Burton committing two violations of the Vehicle Code gave rise to probable cause to stop and detain Burton. **See Feczko**, 10 A.3d at 1291; **Draine**, 2023 WL 7181200, at *4-5; **cf. Commonwealth v. Enick**, 70 A.3d 843, 846 n.3 (Pa. Super. 2013) (noting the probable cause standard requires an officer to articulate specific facts to believe that there was a violation of a provision of the Vehicle Code). Because the stop was lawful, Burton's emphasis on the officer's alleged pretextual motivations, or the fact that the officer might not have cited him, are of no avail. **See Harris**, 176 A.3d at 1020; **Commonwealth v. Spieler**, 887 A.2d 1271, 1275 (Pa. Super. 2005) (noting that an officer has the sole discretion to issue, or decline to issue, a citation). Accordingly, Burton's first issue merits no relief.

In his second issue, Burton alleges the trial court improperly admitted lay opinion concerning the sound of gunshots.

The relevant exchanges occurred during the Commonwealth's direct examination of Mace, a civilian who was in his home and heard gunshots in the evening in question:

A. I heard two gunshots, a small shot, and a larger shot.

Q. . . . How far apart were those two shots?

- 10 -

A. Two seconds.

&ast; &ast; &ast; &ast;

Q. . . . Mr. Mace, are you familiar with firearms?

A. Yes.

Q. And . . . how did it come about that you became familiar with firearms?

A. My dad started a gun shop . . . when I was in high school, and then I graduated, and then I went to another job, but I helped him with it.

Q. You helped him with gunsmithing?

A. Correct.

Q. Sir, how many firearms do you own?

&ast; &ast; &ast; &ast;

A. . . . [M]aybe about [fifteen].

&ast; &ast; &ast; &ast;

Q. From the time you turned [twenty-one] and you started getting involved with gunsmithing to now, . . . [twenty-five] years later, how many guns or how many times -- guns have you fired in that time?

A. A lot. A whole lot of range.

Q. Yeah, can you give us a rough estimate?

A. A .22, a .22 Magnum, .25, .32, .380, []9mm, .44, 308 mag, 270, 12-gauge shotgun, 10-gauge.

&ast; &ast; &ast; &ast;

Q. Okay, now Mr. Mace, how many times have you fired one of those firearms?

A. It depends on what I have, more than a hundred times, it depends on what season it is, you know hunting, you know, fishing, you know. The rest was just sighting in guns, customers.

Q. Okay. So, fair to say, sir, you're very familiar with firearms?

A. Correct.

Q. You indicated just now that you heard a small shot and then a larger shot.  What do you mean by that?  Can you define small and large for us?

N.T., 7/7/22, at 53-55.

Burton objected and at sidebar, he argued that the Commonwealth was eliciting testimony about the caliber of firearms associated with the two types of gunshots.  *See id*. at 56, 60, 62.  Burton asserted such testimony required an expert pursuant to Pa.R.E. 702, and Mace had not provided an expert report.  *See id*. at 60, 62.  The Commonwealth asserted that Rule 701 permitted Mace to testify to a lay opinion, based on his experience, that the gunshots he heard were associated with a range of caliber firearms.  *See id*. at 56-61.  The court overruled Burton's objection.  *See id*. at 62.

Mace then testified as follows:

Q. Can you please tell us, when you say a small sound, what did you believe that to be?

A. Between a .22, .32, .380, .9 . . .

Q. All right, let me -- let me back up again.  When you say those things, you're talking about calibers?

A. Calibers.

Q. Okay, you said []9mm, what else?

A. A .380, a .22, a .22 magnum, .32, .25.

Q. Okay, and you couldn't say with certainty as we sit here which of those, you just knew it was a smaller caliber, one of those that you mentioned?

A. Correct.

Q. When you say a large sound, what did you mean by that?

- 12 -

A. A .45, .38, .357, .44, .40 . . .

Q. Okay, and again, in layman's terms as we sit here, could you just describe what you hear, which signifies to you the difference, how are they different?

A. A smaller caliber makes a smaller sound. A larger caliber makes a larger sound.

*Id*. at 63-64.

Decisions concerning the admissibility of evidence are within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. *See Commonwealth v. Tyson*, 119 A.3d 353, 357 (Pa. Super. 2015). This Court will not disturb an evidentiary ruling unless it reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous. *See Commonwealth v. Huggins*, 68 A.3d 962, 966 (Pa. Super. 2013).

Pennsylvania Rule of Evidence 701 allows a witness, who is not testifying as an expert, to offer opinion testimony if the opinion is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Pa.R.E. 701. Rule 702 governs the admissibility of expert testimony. Expert testimony is permitted only as an aid to the jury when the subject matter is distinctly related to a science, skill, or occupation beyond the knowledge or experience of the average layman. *See Commonwealth v. Jones*, 240 A.3d 881, 890 (Pa. 2020). Expertise may be acquired by formal education or by experience. *Id*. The line between permissible lay opinion and expert opinion

- 13 -

is not always clear. **Compare Commonwealth v. Harper**, 230 A.3d 1231, 1242 (Pa. Super. 2020) (discussing impermissible lay opinion that a gunshot wound was self-inflicted); **with Commonwealth v. Kennedy**, 151 A.3d 1117, 1123 (Pa. Super. 2016) (holding that a police officer could offer a lay opinion concerning the trajectory of bullet based on rods she placed in bullet holes).

Burton argues the trial court erred in allowing Mace to provide expert testimony. **See** Burton's Brief at 18-19. He asserts Mace had specialized knowledge which he employed to link the sounds of gunshots to possible ranges of caliber firearms. **See id**. Burton notes the Commonwealth's questions emphasized that Mace believed the smaller gunshot could have come from a 9mm, the same caliber of weapon found by Burton when officers arrested him. **See id**.

The trial court concluded Burton's issue was meritless. The court reasoned it properly allowed Mace's testimony pursuant to Rule 701 because his opinion was based on "extensive personal experience with firearms, and not based upon specialized training or education." Trial Court Opinion, 4/5/23, at 6-7. The court explained that Mace did not state a scientific conclusion, such as decibel level. **See id**. at 7. Further, the court noted that given the verdict, the jury clearly gave little to no weight to Mace's testimony. **See id**.

Following our review, we discern no basis to reverse the trial court. The parties do not dispute that Mace heard gunshots. His opinion that there was

a "small shot" and a "larger shot" was reasonably based on his first-hand perceptions of the event. His testimony that "a smaller caliber makes a smaller sound[, and a] larger caliber makes a larger sound" was reasonably based on his experience with guns and helpful to understand his testimony about what he heard.

Mace's further testimony associating the "small shot" with a firearm ranging from .22 to 9mm appears closer to a matter involving a particularized understanding of firearms. On the one hand, the subject matter of this testimony possibly strayed beyond the common understanding of an average lay person in a particularized area of experience. Unlike testimony that a smaller caliber firearm makes a smaller sound than a larger caliber firearm, Mace's testimony associating the sounds to ranges of calibers would not likely enhance an average layperson's understanding of the sounds he heard.

On the other hand, shooting guns or hearing gunshots does not involve a specialized area beyond the ken of an average layperson. Mace's testimony about the possible caliber firearms he heard arguably helped determine a fact at issue at trial, *i.e.*, whether Burton fired first with a smaller caliber firearm before Officer McCann initially returned fire using his larger caliber, .45 weapon. Mace did not rely on any scientific, technical, or specialized knowledge to reach and express his belief about the possible caliber weapons he heard. Critically, Mace perceived the gunshots firsthand, and he offered his belief about the possible ranges of caliber firearms based solely on his

personal experiences, not training, or education. Moreover, he did not conclusively state that the "small shot" came from a 9mm, but instead provided a range of possible calibers he associated with that sound.

While this is an unusual case, our review ultimately focuses on whether the trial court abused its discretion. *See Tyson*, 119 A.3d at 357. It is difficult to conclude that Mace's personal experience firing and hearing a variety of firearms was so specialized as to cross the line into expert testimony. *Cf*. *Commonwealth v. T.B.*, 232 A.3d 915, 919 (Pa. Super. 2020) ("[T]echnical expertise does not *ipso facto* convert a fact witness, who might explain how data was gathered, into an expert witness, who renders an opinion based on the data"); *Compare Harper*, 230 A.3d at 1242 (holding an officer's opinion that a gunshot wound was self-inflicted was an improper lay opinion); *with* *Commonwealth v. Kennedy*, 151 A.3d at 1123 (holding an officer's opinion concerning the trajectory of bullet based on rods she placed in bullet holes was an admissible lay opinion). Thus, we decline to disturb the trial court's ruling permitting Mace to testify to his belief that the "small shot" came from a possible range of calibers, including a 9mm.

Even if the trial court abused its discretion, however, no relief would be due. "The harmless error doctrine reflects the reality that the accused is entitled to a fair trial, not a perfect trial." *Commonwealth v. Lamont*, 308 A.3d 304, 313 (Pa. Super. 2024) (internal citation and quotations omitted).

> Harmless error exists if the record demonstrates either: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely

cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Id.* (internal citation omitted).

Here, any error would be *de minimis*. Mace's testimony tended to corroborate other testimony that Burton shot at officers first. The jury apparently rejected that theory when it acquitted Burton on all charges related to shooting at the officers. Moreover, Mace was inside his home when he heard the gunshots. He did not see any of the events leading to Burton's arrest. Therefore, Mace's testimony that he heard gunshots bore no reasonable relationship to who possessed a weapon or who possessed which caliber weapon. Based on this record, we conclude Mace's testimony would be harmless because it did not contribute to Burton's convictions for his unlawful possession of a firearm. Accordingly, Burton's second issue merits no relief.

Burton's third issue focuses on the trial court's verdict slips. ***See*** Burton's Brief at 19-21. With respect to firearms not to be carried without a license, the verdict sheet read:

F. Carrying a Firearm Without a License

On May 10, 2018, did Louis Burton carry a firearm concealed on or about his person without a valid and lawfully issued license to carry the firearm? [Options for Guilty or Not Guilty]

* * * *

G. Possession of a Firearm

- 17 -

On May 10, 2018, was Louis Burton in physical possession or control of a firearm, whether visible, concealed about his person *or within his reach*? [Options for Yes or No].

Verdict Sheet #1, 7/12/22, at 4 (emphasis added). The verdict sheet for possession of firearms prohibited read:

H. On May 10, 2018, was Louis Burton a person convicted of an enumerated offense, to wit: Delivery of a Controlled Substance, and thus prohibited from possessing, using or controlling a firearm? [Options for Guilty or Not Guilty]

I. On May 10, 2018, was Louis Burton in physical possession or control of a firearm, whether visible, concealed about his person *or within his reach*? [Options for Guilty or Not Guilty]

Verdict Sheet #2, 7/12/22, at 1-2 (emphasis added). The "within reach" language in questions G and I is a quotation from the grading provision for possession of firearms prohibited. *See* 18 Pa.C.S.A. § 6105(a.1)(1.1)(i)(B).

This Court reviews a challenge to verdict sheets for abuse of discretion. *See Commonwealth v. Murray*, 248 A.3d 557, 577 (Pa. Super. 2021). Our Supreme Court has stated, "[I]t must be remembered that the verdict slip exists to record the result of the jury's deliberation; it is not the deliberation itself, and the jury's deliberation is guided by the court's charge." *Commonwealth v. Ali*, 10 A.3d 282, 311 (Pa. 2010).

Burton asserts the "within his reach" language was misleading. Burton's Brief at 21. He contends that the language allowed the jury to convict him of the firearms offenses even if he did not actually possess the firearm. *See id*. He claims that the jury could have credited his defense, which implied that an

officer planted the gun after shooting him, yet still found him guilty based on the "within reach" language. *See id*.

The trial court concluded Burton's claim lacked merit. *See* Trial Court Opinion, 4/5/23, at 7-8. The court reasoned the jury found Burton guilty of carrying a concealed firearm on his person and the "within reach" language in the verdict sheets did not confuse or mislead the jury. *See id*. at 8. The court also suggested that Burton failed to object to the language of the verdict sheets. *See id*.

Here, contrary to the trial court's suggestion, Burton did object to the verdict sheets. *See* N.T., 7/6/22, at 7. Nevertheless, as noted by the Commonwealth, this Court can still find waiver. *See* Commonwealth's Brief at 17. At trial, Burton objected to the "within reach" language and argued it was unnecessary based on the evidence. *See* N.T., 7/6/22, at 7. On appeal, however, Burton asserts the language was misleading. *See* Burton's Brief at 21. Burton's trial objection did not give the trial court opportunity to consider whether the language was misleading. It is well settled that this Court will not consider theories for relief not raised in the trial court. *See* ***Commonwealth v. Rosser***, 135 A.3d 1077, 1086 (Pa. Super. 2016) (*en banc*); *see also* Pa.R.A.P. 302(a).

In any event, Burton overstates the significance of the verdict sheets and the "within reach" language. As to firearms not to be carried without a license, the trial court instructed the jury on the substantive element of the

offense, namely, **carrying** a concealed firearm **on his person**. **See** N.T., 7/11/22, at 245-46. The jury found Burton guilty of the offense, as reflected in the verdict sheet. Because the determination of guilt properly included a finding that Burton carried the firearm on his person, the additional question about possession, which included the "within reach" language, was surplusage. Thus, the "within reach" language could not have misled the jury on firearms not to be carried without a license.

As to possession of firearms prohibited, the bifurcated trial commenced after the jury found him guilty of firearms not to be carried without a license. The court issued new jury instructions. **See** N.T., 7/12/22, at 58-65. The court defined the substantive elements of possession of firearms prohibited and stated "[f]or a person to possess a firearm he or she must have the intent to control and the power to control the firearm." **See id**. at 62. We may presume that the jury followed the court's instructions. **See Commonwealth v. Smith**, 956 A.2d 1029, 1035 (Pa. Super. 2008) (*en banc*); **accord Ali**, 10 A.3d at 311 (noting that the court's charge guides the jury's deliberation). Therefore, we discern no basis to conclude that the additional "within his reach" language confused the jury or suggested an improper basis for the guilty verdict. For these reasons, Burton's challenge to the verdict sheets fails.

In his fourth issue, Burton claims the trial court did not adequately cure a mistake during its consciousness of guilt instruction. *See* Burton's Brief at 21-23.

For context, the record shows that the trial court instructed the jury as follows:

> Whether the evidence of flight in this case should be looked at as tending to prove guilt depends upon the facts and circumstances of this case and especially upon motives that may have prompted the flight. ***You may find the Defendant Louis Burton guilty solely -- you may not find the Defendant Louis Burton guilty solely on the basis of evidence of flight***.

N.T., 7/11/22, at 253-54 (emphasis added). At the conclusion of the charge, Burton's counsel stated, "I have no additions, deletions[,] or corrections." *See id*. at 265. The jury then retired for deliberations. *See id*. at 268-69.

An appellant must object to a jury instruction before a jury begins deliberation. *See* Pa.R.Crim.P. 647(c) ("No portions of the charge nor omissions from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate"); *see also* Pa.R.A.P. 302(b) ("Specific exception shall be taken to the language or omission complained of"). Here, Burton failed to object before the jury retired to deliberate. *See* N.T., 7/11/22, at 265. Therefore, his jury instruction issue is waived, and we will not consider it.

In his fifth issue, Burton contests the discretionary aspects of the court's sentence. *See* Burton's Brief at 23-27.

It is well settled that:

> The right to appeal a discretionary aspect of sentence is not absolute. Instead, such challenges are considered petitions for allowance of appeal. Generally, an appellant who wishes to challenge the discretionary aspects of his sentence must satisfy a four-part test to invoke this Court's jurisdiction:
>
> > (1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether appellant's brief has a fatal defect [pursuant to Pa.R.A.P. 2119(f)]; and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

*Commonwealth v. Clemat*, 218 A.3d 944, 959 (Pa. Super. 2019) (internal citations and quotations omitted). An appellant's failure to preserve a sentencing issue in a post-sentence motion and a Rule 1925(b) statement will waive the issue for appellate review. *See Commonwealth v. Bradley*, 237 A.3d 1131, 1139 (Pa. Super. 2020).

Here, Burton's post-sentence motion stated that the trial court "failed to appreciate the extent of the limitations in the range of pain-free motion in [his] leg and the added burden that this permanent injury imposes upon [him] with every step he takes." Post-Sentence Motion, 10/17/22, at 2. Burton's Rule 1925(b) statement asserted that the court erred in denying his post-sentence motion. *See* Rule 1925(b) Statement, 2/15/23, unnumbered at 5.

In his Rule 2119(f) statement, Burton alleges the trial court failed to provide a rationale for imposing sentence, imposed consecutive sentences for offenses arising out of the same act, and failed to consider his rehabilitative and medical needs. *See* Burton's Brief at 23-24. Burton adds the juries acquitted him of shooting at the police. *See id*. at 24. He asserts officers

- 22 -

chased and shot him despite the evidence he merely ran from an unlawful detention. *See id*.

Following our review, we conclude Burton waived his claims concerning the trial court's failure to provide a reason for its sentence; the imposition of consecutive sentences for a single act; and the failure to consider his rehabilitative needs. Although Burton raised the claims in his Rule 2119(f) statement, he did not preserve them in his post-sentence motion or Rule 1925(b) statement. *See Bradley*, 237 A.3d at 1139.

The only sentencing issue preserved for review is the trial court's alleged failure to adequately weigh the injury he suffered when he was shot by police. However, this issue does not raise a substantial question for review. *See Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010) (noting that this Court will not accept a bald claim of sentencing error; rather, an appellant must advance a colorable claim that the sentence was inconsistent with a specific provision of the Sentencing Code or contrary to a fundamental norm of the sentencing process). Therefore, we will not review the merits of his sentencing issue. *See id*. at 175 (concluding a claim that the trial court failed to consider a mitigating factor when imposing consecutive sentences did not raise a substantial question).[8]

_____

[8] We add that even if we granted allowance of appeal to consider Burton's sentencing issue, Burton's counsel has failed to ensure the certified record contained a copy of the sentencing transcript. *See Commonwealth v. Preston*, 904 A.2d 1, 7 (Pa. Super. 2006) (*en banc*) ("When the appellant or
*(Footnote Continued Next Page)*

Judgment of sentence affirmed.

Judge Colins files a concurring memorandum in which Judge Nichols joins.

Judge Nichols concurs in the result of this memorandum.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/17/2024

_____

cross-appellant fails to conform to the requirements of [Pa.R.A.P.] 1911, any claims that cannot be resolved in the absence of the necessary transcript or transcripts must be deemed waived for the purpose of appellate review"). Given our conclusion that Burton has failed to preserve and raise a substantial question for review, we discern no need to take further action to obtain a copy of the sentencing transcript. *See id*. at 7-8.