J-S07008-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSEPH ROY MARTIN | : | |
| | : | |
| Appellant | : | No. 598 MDA 2023 |

Appeal from the Judgment of Sentence Entered March 20, 2023
In the Court of Common Pleas of York County Criminal Division at No(s):
CP-67-CR-0001594-2021

BEFORE:   LAZARUS, P.J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY LAZARUS, P.J.:          **FILED: JULY 24, 2024**

Joseph Roy Martin appeals from the judgment of sentence, entered in the Court of Common Pleas of York County, after a jury convicted him of one count each of person not to possess firearms,[1] firearms not to be carried without a license,[2] driving while operating privilege suspended,[3] failure to display registration plate,[4] and unauthorized transfer or use of registration.[5]

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 6105(a)(1).

[2] *Id.* at § 6106(a)(1).

[3] 75 Pa.C.S.A. § 1543(a).

[4] *Id.* at § 1332.

[5] *Id.* at § 1372(3).

In this appeal, Martin challenges the court's denial of his pre-trial motion to suppress evidence. After careful consideration, we affirm.

Pennsylvania State Police Trooper Joshua Koach testified that, on January 14, 2021, at about 2:30 a.m., while he and his partner were on patrol in a marked vehicle in full uniform, around Red Lion Borough, he observed a vehicle that had no registration plate or light illuminating the plate area of the vehicle. *See* N.T. Suppression Hearing, 7/14/22, at 4-5; *see also* Defense Exhibit 1, at 0:40. Trooper Koach followed Martin, who was the driver and sole occupant of the vehicle, and observed a temporary registration improperly displayed in the wrong corner of the vehicle's rear window. *See* N.T. Suppression Hearing, 7/14/22, at 5; *see also* Defense Exhibit 1, at 1:50-1:55. Trooper Koach activated his police vehicle lights in a safe area of Pennsylvania Route 74, but Martin was slow to respond; Martin continued to drive while making furtive movements in the passenger compartment of the vehicle, and completed two turns before stopping the vehicle perpendicular to, and over, several parking spaces in a business parking lot. *See* N.T. Suppression Hearing, 7/14/22, at 5-6; *see also* Defense Exhibit 1, at 0:46-1:26.

Upon approach, Trooper Koach saw that Martin had lit a cigarette and appeared very nervous. *See* N.T. Suppression Hearing, 7/14/22, at 6. Martin was unable to produce a valid registration for the vehicle, proof of insurance, or a valid driver's license. *Id.* at 6, 10, 17. Martin informed Trooper Koach that he had purchased the vehicle for $1900.00 cash just hours before in

Philadelphia on Facebook Marketplace and was returning home to Chambersburg with the vehicle. *See* N.T. Suppression Hearing, 7/14/22, at 6-7; *see also* Defense Exhibit 1, at 1:57-2:05, 2:51-3:07, 4:23-4:34, 14:45. Trooper Koach found the route chosen by Martin to be odd given Martin's stated starting point and destination, as well as considering the location where Trooper Koach pulled Martin over. *See* N.T. Suppression Hearing, 7/14/22, at 18; *see also* Defense Exhibit 1, at 10:15. Trooper Koach testified that, in his experience, Philadelphia is a hub for criminal activity involving narcotics and guns. *See* N.T. Suppression Hearing, 7/14/22, at 6. Trooper Koach also found Martin's explanation of the late-night vehicle purchase and travel route to be suspicious, and he was concerned the vehicle may have been stolen, either by Martin or the seller. *See* N.T. Suppression Hearing, 7/14/22, at 6-8; *see also* Defense Exhibit 1, at 11:19.

Trooper Koach permitted Martin to call the seller of the vehicle via phone to substantiate his explanation of the vehicle's late-night sale. *See* N.T. Suppression Hearing, 7/14/22, at 7; *see also* Defense Exhibit 1, at 4:23-9:02. The name of the individual that Martin contacted[6] did not match the seller's name on the vehicle title.[7] *See* N.T. Suppression Hearing, 7/14/22;

---

[6] An individual who identified himself as Samuel Marks answered the phone, but the seller's profile name on Facebook was Bob Dent. *See* Defense Exhibit 1, at 3:00-3:45, 5:02, 17:17.

[7] John Joseph McCoullough's name appeared as the owner of the vehicle. *See* N.T. Suppression Hearing, 7/14/22, at 26; *see* Defense Exhibit 1, at 5:17, 6:20, 6:51-7:06.

*see also* Defense Exhibit 1, at 5:02. Further, the individual on the phone stated that he and Martin effectuated the sale with the assistance of a notary. *See* N.T. Suppression Hearing, 7/14/22, at 7, 18-19; *see also* Defense Exhibit 1, at 7:48-8:10. However, Trooper Koach observed that there was no notarization on the title document establishing a proper sale to Martin. *See* N.T. Suppression Hearing, 7/14/22, at 7, 18-19; *see also* Defense Exhibit 1, at 5:49, 8:10, 9:58-10:04.

Thereafter, Trooper Koach and his partner returned to their police vehicle while Martin remained inside his own vehicle and continued talking to the alleged seller on the phone. *See* N.T. Suppression Hearing, 7/14/22, at 25; *see also* Defense Exhibit 1, at 9:02. Trooper Koach ran a search of the improperly displayed temporary registration, but the information and records he discovered from the search did not match the make and model of the vehicle Martin drove. *See* N.T. Suppression Hearing, 7/14/22, at 8; *see also* Defense Exhibit 1, at 9:17. Further, the temporary registration was expired. *See* N.T. Suppression Hearing, 7/14/22, at 17; *see also* Defense Exhibit 1, at 9:37. Trooper Koach also ran a search of Martin's name, which revealed that Martin had a suspended driver's license, that he had prior criminal charges related to delivery of drugs, and that he was a person designated not to possess a firearm. *See* N.T. Suppression Hearing, 7/14/22, at 9, 11; *see also* Defense Exhibit 1, at 9:17, 10:29. When Trooper Koach requested Martin alight from the vehicle, Martin responded with something to the effect of, "I'm going to jail, aren't I?" *See* N.T. Suppression Hearing, 7/14/22, at 9-10; *see*

*also* Defense Exhibit 1, at 13:24. Trooper Koach found this statement to be nonresponsive, which further raised his suspicion that criminal activity may be afoot. *See* N.T. Suppression Hearing, 7/14/22, at 10.

Trooper Koach escorted Martin to stand next to the police vehicle and Martin leaned with his back against the front bumper. *See* N.T. Suppression Hearing, 7/14/22, at 15; *see also* Defense Exhibit 1, at 13:23. Martin continued to appear very nervous. *See* N.T. Suppression Hearing, 7/14/22, at 15; *see also* Defense Exhibit 1, at 21:42, 22:52. Martin explained that he was driving on local roads because the vehicle could not drive above 45 miles per hour, a defect he believed he could fix quickly and inexpensively once home. *See* N.T. Suppression Hearing, 7/14/22, at 18; *see also* Defense Exhibit 1, at 14:02, 14:49. Trooper Koach asked Martin if there was anything dangerous or illegal in the vehicle and asked if he could search it. *See* N.T. Suppression Hearing, 7/14/22, at 10; *see also* Defense Exhibit 1, at 13:30, 16:37. Martin explained that he had just purchased the vehicle, so he was unsure what might be in it and did not want to get in trouble regarding the vehicle's contents leftover from the prior owner. *See* N.T. Suppression Hearing, 7/14/22, at 10, 16; *see also* Defense Exhibit 1, at 13:32, 16:38. Trooper Koach found this response to also be indicative of potential criminal activity. *See* N.T. Suppression Hearing, 7/14/22, at 15-16.

Martin informed Trooper Koach that, although the seller of the vehicle seemed like a "decent dude," who was unlikely to have left anything illegal in the vehicle, Martin still did not want to become responsible for anything the

prior owner might have left inside it, especially given that the paperwork relating to the sale was not in proper order. *See* Defense Exhibit 1, at 16:42-17:11, 17:23. In response to police questions, Martin stated that, at the time of the vehicle's sale, he had seen inside the trunk while the seller replaced the battery connection and there was nothing in there. *See* Defense Exhibit 1, at 17:45-17:53. Thereafter, Martin explained that he did not conduct a full-scale search of the vehicle prior to taking possession and ownership, which he regretted, and he was concerned about the possibility of getting in legal trouble for anything that might be discovered by a police search. *See* N.T. Suppression Hearing, 7/14/22, at 16; *see also* Defense Exhibit 1, at 18:00. While continuing to lean against the front of the police vehicle, Martin noted that his fiancée had warned him about purchasing a car from Philadelphia because people from there sell things they aren't supposed to sell. *See* Defense Exhibit 1, at 18:27.

Upon further questioning, Martin agreed with the troopers that, even if the previous owner had possessed illegal items in the vehicle at a prior time, it would be unlikely that those illegal items remained in the vehicle at the time of its sale. *See* Defense Exhibit 1, at 18:01-18:25. Also, during this interaction, Martin informed the troopers several times that he was concerned about the possibility of going to jail. *See* N.T. Suppression Hearing, 7/14/22, at 10, 16; *see also* Defense Exhibit 1, at 10:36, 18:00, 19:00, 20:25, 20:45-55, 21:48, 22:08-22:48. The troopers responded by informing Martin that

they were unconcerned with discovering small amounts of drugs[8] and that he would not go to jail for the traffic violations or for driving with a suspended license. *See* Defense Exhibit 1, at 22:58.

After several questions from the troopers regarding the circumstances of the sale of the vehicle, the potential contents of the vehicle, why Martin felt he was going to go to jail, why Martin was reluctant to permit a search of the vehicle in light of what he had seen and believed about the vehicle and its previous owner, and the likelihood of illegal items being left in the vehicle, Martin eventually stated that he was aware a firearm was located under the front driver's seat. *See* N.T. Suppression Hearing, 7/14/22, at 10; *see also* Defense Exhibit 1, at 23:12. Trooper Koach immediately found the firearm, took Martin into custody for possession of a firearm, and provided for the vehicle's towing to state police barracks.

The Commonwealth charged Martin with the above-mentioned offenses that same day, January 14, 2021. On July 14, 2022, the court conducted a suppression hearing on Martin's motion *in limine* wherein Martin sought to preclude admission into evidence of Martin's statements about the firearm, as well as the firearm itself, arguing all the evidence is fruit of the poisonous

---

[8] Trooper Koach told Martin he was not concerned about a "dime bag" or "shake." *See* Defense Exhibit 1, at 20:29, 21:51.

tree.[9]  That same day, the court denied Martin's motion to suppress the evidence.

On January 30, 2023, a jury convicted Martin of the above-mentioned firearms offenses and the court, thereafter, convicted Martin of the traffic offenses.  On March 20, 2023, the court sentenced Martin to an aggregate term of 5 years and 30 days to 10½ years' incarceration and ordered Martin to pay costs and a fine.

Martin filed a timely notice of appeal.  Martin and the trial court have complied with Pa.R.A.P. 1925.

On appeal, Martin raises the following two issues for our review:

1. Whether the trial court erred when it denied [] Martin's motion to suppress evidence where the traffic stop was illegally extended beyond the time necessary to address the issue of his vehicle's registration and the totality of the circumstances did not establish reasonable suspicion necessary to warrant extension of the stop?

2. [Whether] the trial court erred when it denied [] Martin's motion to suppress evidence where Martin's statements about the firearm located under the seat of the vehicle were obtained in violation of his rights under *Miranda*?[10]

Appellant's Brief, at 4.

_____

[9] *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *see also Commonwealth v. Shabezz*, 166 A.3d 278, 287 (Pa. 2017) (holding evidence derived from illegal automobile search constitutes fruit of poisonous tree as result of illegal seizure).

[10] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Our standard of review for the denial of a motion to suppress is well-settled:

> [The appellate] standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

***Commonwealth v. Yandamuri***, 159 A.3d 503, 516 (Pa. 2017) (citations omitted). We may affirm the suppression court's decision if there is any basis in the record to support it, even if we rely on different grounds to reach the same result. ***See Commonwealth v. Cartagena***, 63 A.3d 294, 301 (Pa. Super. 2013).

First, Martin argues that, here, just as in ***Rodriguez v. United States***, 575 U.S. 348 (2015), the police impermissibly extended the traffic stop beyond the amount of time necessary to address the vehicle's registration and ownership questions. ***See*** Appellant's Brief, at 12-13. Martin claims that the police improperly and measurably extended the vehicle stop when, during their investigation, they no longer were interested in whether the vehicle was stolen, and instead, became interested in potential contraband inside the vehicle. ***See id.***, at 13-14. Specifically, after about 21 minutes of interaction, Trooper Koach stated to Martin, "[t]he car's not stolen so you don't have to

worry about that, and I already told you I'm not worried about traffic tickets for suspended licenses." Defense Exhibit 1, at 21:20. Martin argues that, based on this statement, the police did not possess sufficient facts to justify prolonging the stop, because, up to that point, "[a]ll they knew was that Martin was nervous, [] afraid of being arrested, and took a circuitous way home due to car troubles." Appellant's Brief, at 14. Martin claims that it is not unusual to be nervous in front of police while being stopped, he was justifiably afraid of being arrested for driving with a suspended driver's license, and it was safer for him to take back roads given the condition of the vehicle. *See id.*

Second, Martin argues that the trial court erred in refusing to suppress the evidence because the police obtained Martin's statements in violation of *Miranda*. Martin claims that the police subjected him to a custodial interrogation when they elicited his incriminating statements. Martin notes that *Miranda* warnings are required, not only for express questioning, but also for any police words or actions that police should know are reasonably likely to elicit incriminating responses. *See* Appellant's Brief, at 16. Martin alleges that he was functionally arrested because: (1) he was removed from the vehicle, and was made to lean on the police vehicle's front bumper, while two officers stood between Martin and the vehicle he was driving—which was his mode of transportation—thereby blocking his access to it; (2) he was far from his destination in Chambersburg; (3) there was no evidence Martin believed he was free to leave, where he was questioned about the contents of

the vehicle he was just driving; and (4) police questioning made it clear that they believed Martin possessed contraband in the vehicle. *Id.* at 17-18. Martin argues that because the police did not give him his *Miranda* warnings, the statements about the firearm, and the firearm itself, should be suppressed as fruit of the poisonous tree. *Id.* at 18-19. We disagree and find Martin is not entitled to any relief on either of his claims.

This Court has previously explained that the United States and Pennsylvania constitutions protect citizens from unreasonable police searches and seizures:

> The Fourth Amendment to the United States Constitution,[11] made applicable to the states through the Fourteenth Amendment, and Article I, Section 8 of the Pennsylvania Constitution[,12] protect a person from unlawful searches and

_____

[11] The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. Amend. IV.

[12] The Pennsylvania Constitution states:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without

*(Footnote Continued Next Page)*

- 11 -

seizures. Our Supreme Court has long held that[,] although the Pennsylvania Constitution provides broader protection from unreasonable searches and seizures than the United States Constitution, the **Terry** doctrine, announced in the seminal case of **Terry v. Ohio**, 392 U.S. 1 [] (1968), sets forth the reasonableness standard for Article I, Section 8 of the Pennsylvania Constitution.

**Commonwealth v. Brame**, 239 A.3d 1119, 1127 (Pa. Super. 2020) (citation,

footnote, quotation marks, and brackets omitted).

Pennsylvania law permits police to stop a vehicle if they observe a traffic

code violation, which creates the necessary probable cause to stop the vehicle,

even if the traffic violation is a minor offense. **See Commonwealth v.**

**Harris**, 176 A.3d 1009, 1019 (Pa. Super. 2017). Further,

[d]uring a traffic stop, the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. If there is a legitimate stop for a traffic violation[,] additional suspicion may arise before the initial stop's purpose has been fulfilled; then, detention may be permissible to investigate the new suspicions.

**Id.** at 1020 (citations, quotation marks, ellipsis, and brackets omitted).

[T]o extend a traffic stop beyond the purposes of enforcing a traffic violation, there must be reasonable suspicion that a defendant may have been engaged in criminal activity independent of the traffic violation. This Court has described the reasonable suspicion standard as follows:

To establish grounds for reasonable suspicion, the officer must articulate specific observations which, in conjunction with reasonable inferences derived from those observations,

---

probable cause, supported by oath or affirmation subscribed to by the affiant.

PA CONST. Art. I, § 8.

led him reasonably to conclude, in light of his experience, that criminal activity was afoot and that the person he stopped was involved in that activity. The question of whether reasonable suspicion existed at the time an officer conduct[ed] the stop must be answered by examining the totality of the circumstances to determine whether the officer who initiated the stop had a particularized and objective basis for suspecting the individual stopped. Therefore, the fundamental inquiry of a reviewing court must be an objective one, namely, whether the facts available to the officer at the moment of the stop warrant a man of reasonable caution in the belief that the action taken was appropriate.

*Commonwealth v. Benitez*, 218 A.3d 460, 471 (Pa. Super. 2019) (citations, quotation marks, and brackets omitted). Further, "even a combination of innocent facts, when taken together, may warrant further investigation by the police officer." *Commonwealth v. Rogers*, 849 A.2d 1185, 1189 (Pa. 2004) (citation and quotation marks omitted).

The United States Supreme Court has identified several lines of inquiry, in addition to "mission-related" questions, that police may lawfully ask, which may extend a traffic stop in time:

[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's "mission"—to address the traffic violation that warranted the stop, and attend to related safety concerns. Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate th[at] purpose." Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.

[. . . . A] traffic stop "can become [unlawful] if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a warning ticket. . . . An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop,

- 13 -

> absent the reasonable suspicion ordinarily demanded to justify detaining an individual.
>
> Beyond determining whether to issue a traffic ticket, an officer's mission includes "ordinary inquiries incident to [the traffic] stop." Typically, such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

*Rodriguez v. United States*, 575 U.S. 348, 354-55 (2015) (citations omitted); *see also Commonwealth v. Malloy*, 257 A.3d 142, 149-50 (Pa. Super. 2021) (permitting mission-related inquiries addressed to traffic violations which originally prompted vehicle stop and inquiries to ensure safe and responsible operation of vehicles on highways, including checking driver's license, outstanding driver warrants, and vehicle's registration and proof of insurance).

During a vehicle stop, the police are permitted to check the vehicle registration, the driver's license, and any other information required to enforce the motor vehicle code. *See Commonwealth v. Mack*, 953 A.2d 587, 589 (Pa. Super. 2008). Also, the officer "may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Commonwealth v. Wright*, 224 A.3d 1104, 1109 (Pa. Super. 2019); *see also Harris*, *supra*. Moreover, police may request a driver to alight from a lawfully stopped car, as a matter of right, without reasonable suspicion that criminal activity is afoot. *See Pennsylvania v. Mimms*, 434 U.S. 106, 109-111 (1977); *Commonwealth*

*v. Brown*, 654 A.2d 1096, 1102 (Pa. Super. 1995). Also, in furtherance of officer safety, Pennsylvania law permits police to ask drivers whether they have a weapon or anything else of a concerning nature as a matter of course during a traffic stop. *See Commonwealth v. Ross*, 297 A.3d 787, 793 (Pa. Super. 2023). Importantly, under certain circumstances, police officers, for their safety, may handcuff individuals during an investigative detention without elevating the interaction into a custodial detention. *See Wright*, 224 A.3d at 1109. The determination of the moment "when tasks tied to the traffic stop are completed or reasonably should have been completed, is fact specific." *Ross*, 297 A.3d at 798.

Further, *Miranda* warnings are only necessary if the detainee is subjected to custodial interrogation. *See Commonwealth v. Baker*, 963 A.2d 495, 500-01 (Pa. Super. 2008). Custodial interrogation is questioning by police "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* (citation and quotation marks omitted). "Police detentions only become custodial when, under the totality of the circumstances, the conditions and/or duration of the detention become so coercive as to constitute the functional equivalent of formal arrest." *Id.* at 501 (citation and quotation marks omitted).

"[T]he test for custodial interrogation does not depend upon the subjective intent of the law enforcement officer interrogator. Rather, the test focuses on whether the individual being interrogated reasonably believes his

freedom of action is being restricted." ***Commonwealth v. Levanduski***, 907 A.2d 3, 24 (Pa. Super. 2006) (citation omitted).

> The factors a court utilizes to determine, under the totality of the circumstances, whether a detention has become so coercive as to constitute the functional equivalent of arrest include: the basis for the detention; its length; its location; whether the suspect was transported against his or her will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened[,] or used force; and the investigative methods employed to confirm or dispel suspicions. The fact that a police investigation has focused on a particular individual does not automatically trigger "custody," thus requiring ***Miranda*** warnings.

***Commonwealth v. Witmayer***, 144 A.3d 939, 948 (Pa. Super. 2016) (citation omitted).

Ordinary traffic stops are typically brief and occur in public view so as not to be custodial for ***Miranda*** purposes. ***See Commonwealth v. Mannion***, 725 A.2d 196, 202 (Pa. Super. 1999) (en banc). Indeed, generally, a vehicle stop is an investigative detention. ***Id.***; ***see also Commonwealth v. Spence***, 290 A.3d 301, 314 (Pa. Super. 2023)

Here, as to Martin's first issue, upon our review, we conclude that the police did not improperly extend Martin's detention; there was sufficient reasonable suspicion to inquire further into a potentially stolen vehicle and/or concealment of contraband. Based on the totality of the circumstances, the following factors raised Trooper Koach's suspicions that such criminal activity was afoot: (1) Martin was driving with a suspended driver's license; (2) Martin failed to provide valid proof of insurance for the vehicle; (3) Martin failed to

provide valid registration for the vehicle; (4) Martin improperly used an expired temporary vehicle registration issued to another vehicle; (5) Martin improperly displayed the expired temporary vehicle registration by placing it in the wrong corner of the rear window; (6) Martin failed to establish his ownership of the vehicle (or permission to drive it) via the vehicle's title documentation and phone call to the alleged seller; (7) the title documentation was not notarized, despite Martin's and the alleged seller's claims that a notary provided assistance with the sale;[13] (8) Martin displayed excessive nervousness throughout the interaction; (9) Martin provided non-responsive answers to police, including several statements regarding his belief that the officers were going to take him to jail; (10) Martin stated, inconsistently, that the vehicle possibly contained contraband from the previous owner, despite also stating that he had seen there was nothing in the trunk or backseat, and despite acknowledging the likelihood was small that the prior owner left contraband in the vehicle; (11) Trooper Koach testified that, in his training and experience, Martin's initial place of departure, Philadelphia, is a hub for illegal narcotics and firearms; (12) Martin's prior criminal history involved delivery of drugs; (13) Martin's status as a person not to possess a firearm;

_____

[13] During his testimony, Trooper Koach likened his understanding of the seller's story regarding going to a notary and failing to have the document notarized, with "going to the grocery store and not buying groceries." N.T. Suppression Hearing, 7/14/22, at 18-19.

(14) the time of day (approximately 3 a.m.);[14] (15) Martin's use of local roads and/or a strange route, using Pennsylvania Route 74, to arrive at his destination in Chambersburg from his origin of Philadelphia; (16) Martin's slow response when pulling over; (17) Martin's furtive movements in the vehicle; and (18) Trooper Koach testified that, in his training and experience investigating stolen vehicles, although this vehicle was not reported stolen at the time of his interaction with Martin, there was a possibility that a stolen vehicle report had not yet been made.[15] *See also Rogers*, 849 A.2d at 1189-90 (police had sufficient reasonable suspicion to extend focus of investigatory detention and pursue suspicions of contraband in vehicle because appellant unusually nervous, appellant stated previous vehicle owner might have left contraband in vehicle and had not yet searched vehicle, paperwork for vehicle out of order and fraudulent, appellant's answers regarding origin were vague, back seat of vehicle contained products police knew, via experience, commonly used in packaging illegal narcotics, and appellant had prior drug conviction). All these factors sufficiently support a finding of reasonable suspicion that Martin was engaged in criminal activity, potentially in connection with concealing contraband or a stolen vehicle, offenses

---

[14] Trooper Koach testified that he was suspicious about the validity of the vehicle's sale to Martin at such a late hour because, in his experience, most vehicle sales do not occur in the late hours of the night, and most notaries are not available at that time, which also contributed to the possibility that the vehicle was stolen. *See* N.T. Suppression Hearing, 7/14/22, at 6-8, 19.

[15] Ultimately, the vehicle was never reported stolen and Martin was able to properly establish his ownership.

independent of the traffic violations, and were sufficient to support an extension of the stop. **See Benitez**, **supra**.

Further, upon our review, we conclude that the police diligently pursued their suspicions during the twenty-three minutes they interacted with Martin prior to Martin's incriminating statements. **See Ross**, 297 A.3d at 797-98 (noting asking additional question or two about firearm is less intrusive than order to exit vehicle, which was constitutionally sound). Indeed, here, the police questions were intended to confirm or dispel suspicions quickly as they attempted to understand why Martin would be concerned that he may be going to jail or that there might be contraband in the vehicle. **See, e.g.**, **Commonwealth v. Freeman**, 150 A.3d 32, 43-44 (Pa. Super. 2016) ("[T]he court should not indulge in unrealistic second-guessing. A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished.") (citation and ellipsis omitted); **id.** at 44 (troopers acted reasonably and diligently in pursuing suspicions during one-hour-plus detention, which did not become custodial). **See also Commonwealth v. Ellis**, 662 A.2d 1043, 1049 (Pa. 1995) (appellant's detention investigative, and not custodial, where it lasted for approximately ten to fifteen minutes and officers diligently pursued attempts to confirm or dispel suspicions).

To the extent that Martin argues that Trooper Koach's concerns regarding ownership of the vehicle were dispelled, as evidenced by Trooper Koach's statement to Martin that, "[t]he car's not stolen so you don't have to

worry about that[,]" Defense Exhibit 1, at 21:20, we find this claim is meritless. We note that the ownership of the vehicle was still not resolved or determined at the time Martin told the police about the firearm. **See** N.T. Suppression Hearing, 7/14/22, at 19. Indeed, the title documentation did not mention Martin, was unnotarized, and the phone call to the alleged seller did not resolve the issue. Further, Trooper Koach testified at the suppression hearing that, in his training and experience investigating stolen vehicles, although this vehicle was not reported stolen at the time of his interaction with Martin, there was a possibility that a stolen vehicle report had not yet been made given it was the middle of the night; Trooper Koach stated, in his experience, there was a possibility the true owner of the vehicle might still have been asleep and would discover the vehicle was stolen the following morning. **Id. See also Commonwealth v. Moser**, 757 A.2d 377, 379 (Pa. Super. 2000) (since no occupant was able to show ownership or permission to drive vehicle, police were justified in checking beyond traffic violation to be sure vehicle was not stolen). Accordingly, we conclude—in addition to establishing grounds related to concealing contraband—that Trooper Koach articulated sufficient facts—in light of his training and experience—to establish that Martin was potentially engaged in concealing the theft of the vehicle, which was sufficient to support an extension of the investigative detention. **See Benitez**, 218 A.3d at 471. Consequently, we find that Martin is not entitled to relief on his first issue.

Next, we conclude that Martin's claim that the police should have provided him with his ***Miranda*** warnings because he was subjected to a custodial interrogation is meritless. ***See Freeman***, ***supra***; ***see also Ellis***, ***supra***. We find that Martin's interaction with the police never escalated beyond an investigative detention. ***See Commonwealth v. Kondash***, 808 A.2d 943, 948 (Pa. Super. 2002) ("the dictates of ***Miranda*** do not attach during an investigatory detention").

Although the troopers requested Martin alight from his vehicle and walk a few yards to stand by the police vehicle, it was for the purpose of separating Martin from the vehicle, for safety reasons, while the officers continued to try to resolve the question of ownership of the vehicle. ***See Brown***, ***supra***; ***see also Commonwealth v. Rosas***, 875 A.2d 341, 348 (Pa. Super. 2005) ("It is well-established that when an officer detains a vehicle for violation of a traffic law, it is inherently reasonable that he or she be concerned with safety and, as a result, may order the occupants of the vehicle to alight from the car.") (citation and quotation marks omitted). Further, as we noted above, the police diligently pursued their suspicions for the twenty-three minutes Martin was stopped. Moreover, although the two troopers stood between Martin and the vehicle during this portion of the interaction, the police never used restraints on Martin and spoke to him in a calm, conversational manner. The police continued to ask Martin questions in an attempt to understand why Martin was concerned that there might be contraband in the vehicle, or to follow up on apparent contradictions and other open questions related to

- 21 -

Martin's answers and the circumstances of the purchase of the vehicle. We discern no abuse of discretion in the court's determination that these facts did not amount to a custodial interrogation. **Cf. Wright**, 224 A.3d at 1109 (for their safety, police officers may handcuff individuals during an investigative detention); **Rosas**, 875 A.2d at 348 (same).

Further, although Martin asked if, or stated that, he would be taken to jail multiple times, each time, police either deescalated the interaction or verbally attempted to assuage Martin's concern. After the first time Martin made such a statement, both troopers returned to their own police vehicle to run the database searches, leaving Martin inside his own vehicle, handing Martin his own phone back to him, and telling Martin to resolve the vehicle ownership issue with the individual on the other end of the phone conversation. **See** Defense Exhibit 1, at 9:02, 10:36; **id.** at 9:02-13:23 (Martin left in vehicle alone for several minutes while police returned to own vehicle and Martin permitted to smoke cigarette and kept phone).

Martin made a similar statement along the lines of, "you're taking me to jail, huh?" as he alighted from the vehicle. **See** Defense Exhibit 1, at 13:24. In response, Trooper Koach responded in the negative and informed Martin he simply wished to talk a little more.[16] **See also** Defense Exhibit 1, at 13:27. As Martin continued to raise the issue of possibly going to jail, the police

---

[16] We note that a police officer's statement that an individual is not under arrest is not dispositive of whether an arrest was effectuated. **See Commonwealth v. Conde**, 822 A.2d 45, 53 (Pa. Super. 2003).

continued to explain they were not concerned with finding small amounts of drugs and were requesting a vehicle search because Martin's statements and circumstances at that hour were suspicious. Even though Martin exhibited nervousness and raised concerns regarding going to jail, we cannot discern from these facts that Martin could reasonably believe that the investigative detention was elevated to a custodial interrogation at the time he disclosed the existence of the firearm where he was informed several times he was not going to jail. Accordingly, we find that Martin is not entitled to relief on his second issue.[17]

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/24/2024

---

[17] Based on our decision herein, we need not reach the court's finding, and the parties' arguments, related to the doctrine of inevitable discovery.